[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10739

_____

D.C. Docket No. 2:12-cv-00005-LGW-JEG

ANTHONY DAVILA,

Plaintiff-Appellant,

versus

ROBIN GLADDEN,
National Inmate Appeals Coordinator, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 9, 2015)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

MARTIN, Circuit Judge:

Anthony Davila, a federal prisoner and a Santeria priest, filed a pro se complaint against a number of prison employees (the Defendants[1]) in their official and individual capacities.  He alleges violations of the First Amendment and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, and seeks injunctive and monetary relief.  Mr. Davila has alleged that his religious beliefs require him to wear a unique set of beads and shells that are infused with the spiritual force Ache.  His lawsuit asserts that the Defendants violated his rights by refusing to allow him to receive his personal beads and shells from his goddaughter.  The District Court dismissed Mr. Davila's claims for money damages under RFRA.  It also granted summary judgment to the Defendants on Mr. Davila's First Amendment claims and on his claim for injunctive relief under RFRA.  Mr. Davila, now counseled, asks us to reverse.  After careful consideration, and having the benefit of oral argument, we conclude that the District Court erred in granting summary judgment on Mr. Davila's claim for injunctive relief under RFRA.  We affirm the remainder of the District Court's holdings.

---

[1] In his amended complaint, Mr. Davila listed a number of people as the Defendants.  But he only prosecutes this appeal as to the prison chaplain, Dr. Bruce Cox, and the warden, Anthony Hayes.  When we refer to the Defendants, we mean Dr. Cox and Warden Hayes.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case involves the Santeria faith, a belief system that has been a recurring subject of litigation in federal courts.  Briefly, "[t]he basis of the Santeria religion is the nurture of a personal relation with . . . orishas [spirits], and one of the principal forms of devotion is an animal sacrifice."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 524, 113 S. Ct. 2217, 2222 (1993) (emphasis omitted).  "According to Santeria teaching, the orishas are powerful but not immortal.  They depend for survival on the sacrifice."  Id. at 525, 113 S. Ct. at 2222.  In particular, "[s]acrifices are performed . . . for the initiation of new members and priests."  Id.

Mr. Davila is a long-time practitioner of Santeria.  During his seven-day initiation ceremony to become a priest, he received a set of personal Santeria beads and Cowrie shells that were infused with a spiritual force called "Ache," which he believes to be the spiritual presence of an orisha.  According to Mr. Davila, Ache is infused into the beads and shells during this ceremony by soaking the beads and shells in animal blood, and then rinsing them in an "elixir" containing dozens of plants and minerals.  Mr. Davila states that he now wears these unique beads and shells "for personal protection and spiritual guidnaces [sic] as an essential element of [his] faith."  For Mr. Davila, wearing beads and shells that have not been infused with Ache would be useless, if not blasphemous.

3

In June 2011, Mr. Davila, then and now a prisoner at the Federal Correctional Institution in Jesup, Georgia, made a request under the Federal Bureau of Prisons (BOP) regulations to have his personal Santeria necklaces and Cowrie shells delivered to him in prison by his goddaughter, who is a Santeria priestess. Dr. Cox, the prison's Supervising Chaplain, denied the request, stating that religious items must be received only from "approved vendors" listed in the prison catalog, and that "[f]or the purpose of security, authorization to grant family members, friends, and acquaintances send in [sic] religious articles for inmates will be prohibited."

Mr. Davila appealed this decision, first to the prison warden, and then to the BOP Regional Director. Both denied his request. The Regional Director cited the BOP's Program Statement concerning Religious Beliefs and Practices, which says that religious items "will be purchased either from commissary stock or through an approved catalog[] source using the Special Purpose Order process." BOP Program Statement 5360.09, Religious Beliefs and Practices, ¶ 14(a). While the existing catalog offers bead necklaces and Cowrie shells, these items have not been infused with Ache through animal sacrifice.

On January 9, 2012, Mr. Davila filed this suit in federal court. He alleged that the Defendants violated his rights under the First Amendment's Free Exercise

4

Clause and RFRA.[2]  He seeks an injunction and money damages against the Defendants in their individual and official capacities.  The Defendants filed a motion to dismiss Mr. Davila's action, and the District Court granted that motion as to his claims for money damages under RFRA against the Defendants in their individual and official capacities.  The District Court also dismissed Mr. Davila's First Amendment money damages claim against the Defendants in their official capacities.  At that time, the District Court allowed the RFRA claim for injunctive relief and the remaining First Amendment claims to go forward.  The Defendants then filed a motion for summary judgment on Mr. Davila's remaining claims, and the District Court granted that motion.  We now consider Mr. Davila's appeal of those rulings.

## II. STANDARDS OF REVIEW

We review "de novo a district court's denial of summary judgment, applying the same legal standards that governed the district court." Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam).  A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[2] Mr. Davila also challenged the prison's actions under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1.  The District Court dismissed that claim in its grant of the Defendants' motion to dismiss because, as the Magistrate Judge correctly noted, "RLUIPA clearly does not create a cause of action against the federal government or its correctional facilities."  Mr. Davila does not challenge that decision here.

5

law." Fed. R. Civ. P. 56(a). We "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Carter, 731 F.3d at 1166 (quoting Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1143 (11th Cir. 2007)).

Likewise, "[w]e review a district court order granting a motion to dismiss de novo, applying the same standard as the district court." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). We "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Id.

### III. RFRA CLAIM FOR INJUNCTIVE RELIEF

We first address Mr. Davila's claim for injunctive relief under RFRA, on which the District Court entered summary judgment in favor of the Defendants. "Congress enacted RFRA . . . in order to provide very broad protection for religious liberty." Burwell v. Hobby Lobby Stores, Inc., ___ U.S. ___, 134 S. Ct. 2751, 2760 (2014). Under the statute, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). If the Government takes action that substantially burdens a person's exercise of religion, it must "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb-1(b). We address each part of the

6

test in turn.  After careful review of the record in the light most favorable to Mr. Davila, we conclude that the District Court erred in granting summary judgment on Mr. Davila's RFRA claim for injunctive relief.

### A. Substantial Burden on Mr. Davila's Religious Exercise

Under RFRA, a plaintiff must first show that the Government has substantially burdened his exercise of religion.  In evaluating these claims, a district court must determine whether an inmate's (1) religious exercise is (2) substantially burdened by prison policy.  § 2000bb-1(a).  No one has seriously disputed that Mr. Davila's beliefs about his religious exercise were sincerely held.  However, the Magistrate Judge who first considered this case found that the "Defendants' application of Program Statement 5360.09 [did] not impose a substantial burden on [the] Plaintiff's exercise of his religion."  The District Court adopted that finding in full.  Because we remand on this RFRA claim, we begin with the standard under RFRA's first prong.

First turning to religious exercise, the Supreme Court recently explained that "it is not for us to say that [a plaintiff's] religious beliefs are mistaken or insubstantial.  Instead, our 'narrow function . . . in this context is to determine' whether the line drawn [between conduct that is and is not permitted under one's religion] reflects an <u>honest conviction</u>."  <u>Hobby Lobby</u>, 573 U.S. at ___, 134 S. Ct. at 2779 (emphasis added) (quoting <u>Thomas v. Review Bd. of Ind. Emp't Sec. Div.</u>,

450 U.S. 707, 716, 101 S. Ct. 1425, 1431 (1981)).  This rule minds the Supreme

Court's warning that judges "must not presume to determine the place of a

particular belief in a religion or the plausibility of a religious claim."  Emp't Div.

v. Smith, 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990); see also Thomas, 450

U.S. at 716, 101 S. Ct. at 1431 (insisting that judges not become "arbiters of

scriptural interpretation").  A secular, civil court is a poor forum to litigate the

sincerity of a person's religious beliefs, particularly given that faith is, by

definition, impossible to justify through reason.  See Hernandez v. Comm'r, 490

U.S. 680, 699, 109 S. Ct. 2136, 2148 (1989) ("It is not within the judicial ken to

question the centrality of particular beliefs or practices to a faith, or the validity of

particular litigants' interpretations of those creeds."); Watts v. Fla. Int'l Univ., 495

F.3d 1289, 1297 (11th Cir. 2007) ("It is difficult to gauge the objective

reasonableness of a belief that need not be acceptable, logical, consistent, or

comprehensible to others.").  As our sister circuit noted in the related context of

RLUIPA, "Congress made plain that we . . . lack any license to decide the relative

value of a particular exercise to a religion."  Yellowbear v. Lampert, 741 F.3d 48,

54 (10th Cir. 2014).  That being the case, we look only to see whether "the

claimant is (in essence) seeking to perpetrate a fraud on the court—whether he

actually holds the beliefs he claims to hold."  Id.

8

At this stage of the litigation, these Defendants have not argued that Mr. Davila's religious beliefs were not sincerely held.  Neither did the Magistrate Judge or the District Court grant summary judgment on the basis of the sincerity of Mr. Davila's religious beliefs.  Although the Defendants may contest the issue at trial, the record at summary judgment contains no evidence that Mr. Davila has fabricated his stated need for beads and shells infused with Ache.  Summary judgment would therefore not be appropriate on this ground.

Second, the question of whether Mr. Davila's religious exercise was substantially burdened is also straightforward on this summary judgment record. We have "made clear that, in order to constitute a 'substantial burden' on religious practice, the government's action must be 'more than . . . incidental' and 'must place more than an inconvenience on religious exercise.'  That is, to constitute a substantial burden [], the governmental action must significantly hamper one's religious practice."  Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir. 2007) (citation omitted) (quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)), abrogated on other grounds by Sossamon v. Texas, 563 U.S. ___, 131 S. Ct. 1651 (2011).  The Supreme Court has observed that the test for whether a person's religious exercise is substantially burdened is not "whether the religious belief asserted in a RFRA case is reasonable."  Hobby Lobby, 573 U.S. at ___, 134 S. Ct. at 2778.  Instead, we look to "whether the [government's

9

rule] imposes a substantial burden on the ability of the objecting part[y] to conduct [himself] in accordance with [his] religious beliefs." Id. (emphasis omitted); see also Yellowbear, 741 F.3d at 55 (noting that a burden is substantial when it "prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief").

The record before us reflects only that Mr. Davila's religious beliefs require him to wear beads and shells infused with Ache. The Defendants presented no evidence or argument to support a finding that Mr. Davila's exercise of his religious practices would not be burdened if he is continued to be denied these things. Mr. Davila has therefore shown, at least at this stage of the litigation, that the Defendants substantially burdened his religious exercise by flatly preventing him from having his beads and shells. On this record, the District Court erred in its finding that Mr. Davila's sincerely held religious beliefs were not substantially burdened.

## B. In Furtherance of a Compelling Governmental Interest

Once a plaintiff shows that his exercise of religion is substantially burdened, the Government must demonstrate that its challenged actions are in furtherance of a compelling governmental interest. To make this showing, the Defendants tell us that the compelling governmental interest of security and order justifies keeping inmates from getting religious items from unauthorized sources. Mr. Davila

10

concedes that prison order and security are compelling governmental interests. See Pell v. Procunier, 417 U.S. 817, 823, 94 S. Ct. 2800, 2804 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). However, he argues that the Defendants did not show, for purposes of summary judgment, that the prison policy here actually furthers these interests. See Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 533 (11th Cir. 2013) (finding that "[w]hile safety and cost can be compelling governmental interests, the Defendants have not carried their burden to show that [the] policy in fact furthered these two interests" for summary judgment purposes). We agree.

In evaluating whether particular policies are in furtherance of a compelling governmental interest, courts should "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431, 126 S. Ct. 1211, 1220 (2006). As we recently observed, "[w]hile we are mindful of our obligation to give due deference to the experience and expertise of prison and jail administrators, policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." Rich, 716 F.3d at 533 (citations and quotation marks omitted). For instance, in Rich, we

11

overturned a district court's grant of summary judgment rejecting a prisoner's RLUIPA claim, because the prison's evidence of security concerns was "speculative" and the prison's cost projections made assumptions that were not supported by the record.  716 F.3d at 533–34.

There are genuine disputes of material fact in the record before us about whether prohibiting Mr. Davila from having his personal beads and shells furthers a compelling governmental interest.  The Defendants argue generally that the BOP has a broad, compelling governmental interest in security and order that justifies preventing inmates from getting religious items from unauthorized outsiders.  The Defendants rely on the prison warden's affidavit, which reads: "permitting inmates to obtain personal religious items from unauthorized outsiders such as family and friends would have a major impact on prison staff and inmates, as allowing such would drastically increase an inmate's ability to smuggle contraband and/or weapons into the prison."  The Defendants also point to the cost of screening items.  For this, they again cite to the warden's affidavit, which states: "allowing prisoners to obtain religious items from unauthorized sources would also have a major impact on prison resources, as prison staff would then be required to spend more time and money screening and examining those items before an inmate would be allowed to take possession of such items."

However, the Defendants' generalized statement of interests, unsupported by specific and reliable evidence, is not sufficient to show that the prison restriction furthered a compelling governmental interest.  The Defendants offer little more than a conclusory assertion that if they grant Mr. Davila's request, there will be a significant impact on security interests and cost concerns.  On this record, we are left to wonder about the number of prisoners who may similarly request religious objects; any processes the prison currently has for screening objects from outside sources; past incidents of mailed contraband that justify the warden's security fears; and the actual costs and time the prison would need to spend on screening. The only source of information about these crucial questions is the prison warden's terse affidavit.  But prison officials cannot simply utter the magic words "security and costs" and as a result receive unlimited deference from those of us charged with resolving these disputes.  See Gonzales, 546 U.S. at 438, 126 S. Ct. at 1225 ("[U]nder RFRA invocation of such general interests, standing alone, is not enough.").  Doing so would ignore RFRA's plain meaning and intent.

We are quite mindful that for prisons, we must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S. Ct. 2113, 2123 (2005) (citation omitted).  But here,

where the prison has offered no evidence to justify its cost and safety concerns, the requirements of RFRA have not been met.  The Defendants have failed, as a matter of law, to meet their burden of demonstrating that their policy furthers a compelling governmental interest.  Because there are genuine disputes of material fact about whether prohibiting Mr. Davila from having his personal beads and shells furthers a compelling governmental interest, the District Court erred in granting summary judgment to the Defendants on this ground.

## C. Least Restrictive Alternative

Even if the Defendants had shown a compelling governmental interest justifying the burden on Mr. Davila's religious exercise as a matter of law, they have not shown that their wholesale ban on religious items outside the catalog is the least restrictive means for furthering that interest.  The Supreme Court recently reminded us that "[t]he least-restrictive-means standard is exceptionally demanding."  Hobby Lobby, 573 U.S. at ___, 134 S. Ct. at 2780.  Although "cost may be an important factor in the least-restrictive-means analysis, . . . RFRA . . . may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs."  Id. at 2781.

In his response to the Defendants' motion for summary judgment, Mr. Davila argued that the least restrictive means would have been for Dr. Cox to contact a qualified Santeria priest or priestess, such as his goddaughter, and

14

designate that person as an approved vendor for Ache-infused items.  Mr. Davila says this process could be done at a de minimis cost to the prison.  The Defendants presented no evidence refuting this assertion other than to say that BOP policy prohibits obtaining a religious item from a source other than an approved vendor's catalog.  In rebuttal, Mr. Davila responds that, while the Program Statement generally requires prisoners to get religious items through a specified catalog, it also includes a directive that prisons create "[p]rocedures for acquiring authorized religious items when no catalog vendor is available."[3]  That the prison's own policy contemplates exemptions from the catalog requirement undercuts the Defendants' argument that a categorical prohibition on non-catalog religious objects is the least restrictive means of achieving their objectives.

Beyond that, the record also reflects that the prison allowed Mr. Davila to receive prescription eyeglasses by mail from a family member.  This evidence at least raises important questions about what procedures the prison already has in place to screen items brought in from outside the prison; how effective those existing procedures are; and how burdensome it would be to simply screen

---

[3] The Defendants argue that this portion of the Program Statement is not contained in the record, and that we therefore should not address it.  But we may take judicial notice of a federal prison manual that is readily available to the public.  See, e.g., United States v. Thornton, 511 F.3d 1221, 1229 n.5 (9th Cir. 2008) (taking judicial notice of a BOP Program Statement regarding organ transplants for prisoners); Antonelli v. Ralston, 609 F.2d 340, 341 n.1 (8th Cir. 1979) (taking judicial notice of a Program Statement issued by the BOP relating to prisoners' mail).

religious items through that same established procedure.  See Hobby Lobby, 573 U.S. at ___, 134 S. Ct. at 2780 (holding that the government had not shown that the contraceptive mandate at issue was the least restrictive alternative to providing contraceptive coverage to women because "HHS ha[d] not provided any estimate of the average cost per employee of providing access to . . . contraceptives."). There are therefore genuine disputes of material fact about whether the BOP's policy decision in this case constituted the least restrictive means to further security and cost management.  On this record, the District Court erred in granting the Defendants' summary judgment motion on Mr. Davila's RFRA claim for injunctive relief.[4]

## IV. RFRA CLAIM FOR MONEY DAMAGES

We turn next to the question of whether Mr. Davila would be entitled to money damages if he succeeds on his RFRA claim at trial.  RFRA provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c) (emphasis

---

[4] The Defendants cite Brunskill v. Boyd, 141 F. App'x 771 (11th Cir. 2005) (per curiam) (unpublished), in which this Court held that denying a prisoner's request to possess religious materials including "tobacco, sage, cedar, sweetgrass, beads, leather, thread, needles, and feathers" was the "least restrictive means in furthering compelling governmental interests in the security, health, and safety of inmates and staff."  Id. at 773, 776.  However, this case is unpublished and therefore not binding precedent.  It was also decided well before the Supreme Court's Hobby Lobby decision.

added).  The "term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States . . . ."  Id. § 2000bb-2(1).  "[A]ppropriate relief" is not defined by the statute.  Though it is uncontroversial that the "appropriate relief" language authorizes injunctive relief, see, e.g., Gonzales, 546 U.S. at 423, 126 S. Ct. at 1216 (upholding the issuance of an injunction against the federal government under RFRA), the availability of money damages is a question as yet unanswered by both this Court as well as the Supreme Court.

So we now take up two questions of first impression: whether RFRA authorizes suits for money damages against officers in their (1) official or (2) individual capacities.[5]  Our analysis for each type of suit is distinct.  Cf. Allen, 502

---

[5] The Defendants argue that we should not address rulings that the District Court made at the motion-to-dismiss stage because Mr. Davila failed to specifically reference the order granting the motion to dismiss in his notice of appeal.  We review de novo questions concerning our subject-matter jurisdiction.  Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006).  Federal Rule of Appellate Procedure 3(c)(1)(B) provides that a notice of appeal "must . . . designate the judgment, order, or part thereof being appealed."  In his notice of appeal, Mr. Davila specifically referenced "the judgment entered by the Honorable Chief Judge Lisa Godbey Wood on February 6th 2013, to the Eleventh Circuit Court of Appeals in Atlanta, Georgia."  He made no reference to the District Court's grant of the Defendants' motion to dismiss.  If Mr. Davila cannot challenge the grant of the Defendants' motion to dismiss, the court would lack subject matter jurisdiction to address his claims regarding monetary relief under RFRA.

The Defendants overlook, however, that we always construe pro se pleadings liberally.  Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam).  Mr. Davila was uncounseled at the time he filed his notice of appeal.  Beyond that, we have held that "since only a final judgment or order is appealable, the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment."  Barfield v. Brierton, 883 F.2d 923, 930 (11th Cir. 1989) (footnote omitted).  The issues that were dismissed at the motion-to-dismiss stage are "inextricably intertwined" with those the District Court denied at the summary judgment stage, Hill v. BellSouth Telecomm., Inc., 364 F.3d 1308, 1313 (11th Cir.

17

F.3d at 1272 (treating as separate the questions of authorization for suits for money damages in officers' individual and official capacities under RLUIPA).  While an officer can assert personal-immunity defenses like qualified immunity for suits against him in his individual capacity, the only immunity defenses he can assert in suits against him in his official capacity are forms of sovereign immunity.  Id. at 1272–73.  After careful consideration, we conclude that Congress did not clearly waive sovereign immunity to authorize suits for money damages against officers in their official capacities under RFRA.  Also, even if we were to assume the statute authorizes suits for money damages against officers in their individual capacities, we hold that the Defendants here would be entitled to qualified immunity.

## A. Suits Against Officers in Their Official Capacities

First, we address whether Congress authorized suits for money damages against officers in their official capacities when it passed RFRA.  In order to authorize official-capacity suits, Congress must clearly waive the federal government's sovereign immunity.  According to the Supreme Court, "a waiver of sovereign immunity must be unequivocally expressed in statutory text."  FAA v.

---

2004) (citation omitted), because they all have to do with Mr. Davila's religious rights under the same set of facts.  In any event, the Defendants have not been "prejudiced," id., because—regardless of the clarity of the notice of appeal—they have argued the money damages questions in their brief before this Court.  In short, "[i]t is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities."  Foman v. Davis, 371 U.S. 178, 181, 83 S. Ct. 227, 230 (1962).  We therefore address the money damages questions dismissed by the District Court.

18

Cooper, 566 U.S. \_\_\_, \_\_\_, 132 S. Ct. 1441, 1448 (2012) (quotation marks omitted).  "Any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires."  Id. (citations omitted).  "Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government."  Id.  At the same time, the Court does not require that Congress use specific language, and the "sovereign immunity canon . . . does not 'displace the other traditional tools of statutory construction.'"  Id. (quoting Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 589, 128 S. Ct. 2007, 2019 (2008)) (alteration adopted).

In Sossoman v. Texas, 563 U.S. \_\_\_, \_\_\_, 131 S. Ct. 1651, 1658 (2011), the Supreme Court held that identical "appropriate relief" language in the related statute RLUIPA did not waive states' sovereign immunity from money damages. Id. at 1658.[6]  "Appropriate relief," according to the Court, "is open-ended and ambiguous about what types of relief it includes."  Id. at 1659.  It is a "context-dependent" phrase, and "[t]he context here—where the defendant is a sovereign—suggests, if anything, that monetary damages are not suitable or proper."  Id. (quotation marks omitted).  The only two circuit courts to address whether RFRA

---

[6] Sossoman abrogated our decision in Allen, 502 F.3d 1255, to the extent that it allowed a suit for damages against RLUIPA against government officials in their official capacity.  See Sossamon, 563 U.S. at \_\_\_, 131 S. Ct. at 1657.

waived the federal government's sovereign immunity have held that it did not.  See

Oklevueha Native Am. Church of Haw., Inc. v. Holder, 676 F.3d 829, 841 (9th Cir.

2012) (holding that "[a]lthough the Supreme Court in Sossamon considered claims

against a state, rather than federal actors, and was therefore guided by the Eleventh

Amendment, the Court's interpretation of 'appropriate relief' is also applicable to

actions against federal defendants under RFRA" (footnote omitted)); Webman v.

Fed. Bureau of Prisons, 441 F.3d 1022, 1026 (D.C. Cir. 2006) (holding that it

could not find "an unambiguous waiver in language this open-ended and

equivocal").

Arguing that Congress waived the Government's sovereign immunity, Mr.

Davila asks us to consider the statutory interpretation canon that "Congress is

aware of existing law when it passes legislation."  Griffith v. United States, 206

F.3d 1389, 1393 (11th Cir. 2000) (quotation marks omitted).  The purpose of

RFRA, according to Mr. Davila, was "to restore the status of an individual's right

to sue under the First Amendment which existed prior to 1993."  And prior to

1993, a number of cases had recognized a claim for money damages against the

United States for violations of a constitutional right.  See Pet'r's Br. 50 & n.16

(citing cases).  Based on this, he argues that Congress intended to waive its

sovereign immunity in light of the existing law at the time of RFRA's passage.

20

We reject Mr. Davila's analysis, and instead follow the lead of our sister circuits.  Though Mr. Davila is certainly right about the existence of a canon that "Congress is aware of existing law when it passes legislation," he has pointed to no case holding that such a general interpretive rule overrides the specific rule governing a waiver of sovereign immunity.  The fact remains that "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." Cooper, 566 U.S. at ___, 132 S. Ct. at 1448.  Also, Mr. Davila's argument is difficult to square with the Supreme Court's reasoning in Sossamon—which directly addressed the ambiguity of the phrase "appropriate relief."  We recognize that in Sossamon, the Court was addressing the sovereign immunity of the states.[7] However, the Court's analysis in addressing the ambiguity of "appropriate relief" applies equally to issues of federal sovereign immunity.  Congress did not unequivocally waive its sovereign immunity in passing RFRA.  RFRA does not therefore authorize suits for money damages against officers in their official capacities.

---

[7] Congress "enact[ed] RLUIPA pursuant to its Spending Clause and Commerce Clause authority." Sossamon, 563 U.S. at ___, 131 S. Ct. at 1656.  It targets state and police action that restricts the religious exercise of people who are institutionalized. Id.  RFRA, on the other hand, was enacted pursuant to Congress' power under Section 5 of the Fourteenth Amendment, and applies only to the federal government. Id.

21

## B. Qualified Immunity

Second, we decline to address whether RFRA authorizes suits against officers in their individual capacities. Even if RFRA did authorize individual-capacity suits for money damages, these Defendants would be entitled to qualified immunity.[8]

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009) (quotation marks omitted). "In analyzing the applicability of qualified immunity, the Court has at its disposal a two-step process. Traditionally, a court first determines whether the officer's conduct amounted to a constitutional violation. Second, the court analyzes whether the right violated was 'clearly established' at the time of the violation." Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (citations omitted), cert. denied, 559 U.S. 936, 130 S. Ct. 1503 (2010). However, under Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), courts are no longer required to conduct the qualified immunity analysis in this order. We

---

[8] Mr. Davila argues that because the question of qualified immunity was not addressed by the District Court, it is "premature to look at the issue in this Court." However, "[w]e may affirm a decision on any adequate grounds, including grounds other than the grounds upon which the district court actually relied." Rowe v. Schreiber, 139 F.3d 1381, 1382 & n.2 (11th Cir. 1998) (affirming summary judgment dismissal on qualified immunity grounds even when the district court granted summary judgment on absolute immunity grounds).

may "exercise [our] sound discretion" in deciding which prong of the inquiry to address first. Id. at 236, 129 S. Ct. at 818. Here, we begin and end our qualified immunity analysis with the second question—whether it was clearly established at the time of the incident that the Defendants violated Mr. Davila's constitutional rights. We hold that it was not.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). This Court has observed that "[a] government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the preexisting law dictates, that is, truly compels, the conclusion for all reasonable similarly situated public officials that what [a] Defendant was doing violated [a] Plaintiff's federal rights in the circumstances." Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1030–31 (11th Cir. 2001) (en banc) (alteration adopted) (quotation marks omitted), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007).

Whether or not the District Court concludes that the Defendants violated Mr. Davila's rights under RFRA at trial, the law preexisting the Defendants' conduct did not compel the conclusion that their actions violated RFRA. Mr. Davila offers three reasons why his right to obtain his beads and shells infused with Ache was

23

clearly established.  First, he argues that the BOP's Program Statement required the prison to supplement its ordinary procedures for obtaining religious items when Mr. Davila could not get the items he needed from the prison catalog.  He says the Defendants knowingly ignored that Statement.  Second, he points out that the Supreme Court has affirmed Santeria as a religion entitled to free exercise rights.  And third, he argues that "the issue of whether a prison could prevent members of the Santeria religion from having their personal religious items mailed to them has already been litigated, and the outcome was in favor of the prisoners practicing Santeria."  Pet'r's Br. 55 (citing Campos v. Coughlin, 854 F. Supp. 194, 214 (S.D.N.Y. 1994)).

None of these reasons demonstrates a clearly established rule that Mr. Davila is entitled to his beads and shells.  First, the fact that the Program Statement requires the Defendants to enact reasonable supplements to the ordinary processes for obtaining religious items does not clearly establish what types of religious accommodations are mandated by RFRA.  Second, the fact that the Supreme Court in Church of Lukumi Babalu Aye, Inc., 508 U.S. 520, 113 S. Ct. 2217, recognized that Santeria is a religion generally entitled to protections does not clearly establish the precise types of protections its followers are statutorily entitled to receive.  Officers are entitled to clear notice about how their actions violate federal rights.  In order to do away with qualified immunity for these offices, it must have been

24

clearly established under RFRA that a prisoner can get religious property from outside sources when the religious items available through authorized means are not sufficient to meet the prisoner's religious needs.  Mr. Davila has offered no prior case clearly establishing that proposition.  Finally, the Campos case Mr. Davila cites is distinguishable because it held that a Department of Correctional Services directive that "prohibit[ed] prisoners from wearing certain religious artifacts, including plaintiffs' religious beads" violated the First Amendment. Campos, 854 F. Supp. at 197 (emphasis added).  Regardless, that case is from a district court in another jurisdiction and does not interpret RFRA.  See Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 955 (11th Cir. 2003) ("[O]nly Supreme Court cases, Eleventh Circuit caselaw, and Georgia Supreme Court caselaw can 'clearly establish' law in this circuit.").  Campos does not therefore clearly establish a right under RFRA in the Eleventh Circuit.  For those reasons, these Defendants are entitled to qualified immunity.  So even if Mr. Davila is successful at trial in proving a RFRA violation, these Defendants would be protected from paying money damages in their individual capacities.

## V. FIRST AMENDMENT CLAIM

Finally, we turn to Mr. Davila's First Amendment claim.  The Supreme Court has noted two principles that affect religious rights of prisoners under the First Amendment: first, that "[p]rison walls do not form a barrier separating prison

25

inmates from the protections of the Constitution," Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 2259 (1987), and second, that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," Procunier v. Martinez, 416 U.S. 396, 405, 94 S. Ct. 1800, 1807 (1974).  With these principles in mind, courts require that prison rules which fail to accommodate sincerely held religious beliefs be "reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89, 107 S. Ct. at 2261.  The standard divides into four factors: (1) whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional rights that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted rights will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether there are "obvious, easy alternatives" to the prison's policy that would accommodate the prisoner's religious beliefs.  Turner, 482 U.S. at 89–90, 107 S. Ct. at 2261–62.[9]

Our review of a prison restriction under the First Amendment is different from our review of that same restriction under RFRA.  While the First Amendment

---

[9] It has not been established whether the Supreme Court's sweeping decision in Smith, which held that neutral laws of general applicability are usually constitutional under the Free Exercise Clause, overruled the more rigorous test from Turner.  But since the parties have not raised it, we need not address that tension here.  See Hakim v. Hicks, 223 F.3d 1244, 1247 n.3 (11th Cir. 2000) ("The DOC has not argued in this case that the Supreme Court's decision in [Smith] requires application of a different standard.  Accordingly, we do not decide the issue.").

requires only that prison restrictions be reasonably related to legitimate penological interests, RFRA requires restrictions to be the least restrictive alternatives to furthering compelling governmental interests.  That RFRA may offer an avenue of relief where the First Amendment does not is no surprise.  Congress said when it passed RFRA that "the intent of the act [was] to restore the traditional protection afforded to prisoners to observe their religions which was weakened by the [Supreme Court's] decision in O'Lone v. Estate of Shabazz[, 482 U.S. 342, 107 S. Ct. 2400 (1987)]."  S. Rep. 103-111, at 9 (1993), as reprinted in 1993 U.S.C.C.A.N. 1892, 1899; see also Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996) (per curiam) (comparing the "unadorned rational basis test" from O'Lone with the compelling interest test that RFRA reintroduced).  Notably, in the recent Hobby Lobby decision, the Supreme Court recognized that RFRA today represents "a complete separation from First Amendment case law."  573 U.S. at ___, 134 S. Ct. at 2762.

Applying the First Amendment's "unadorned rational basis standard" to the record before us, we conclude that the District Court properly granted summary judgment to the Defendants on this claim.  Because, at this stage of the proceedings, the Defendants have not challenged the sincerity of Mr. Davila's claim that his beliefs require him to wear beads and shells infused with Ache, see supra Part III.A, we turn directly to the four-part test.

27

First, there is no genuine dispute about whether there is a "valid, rational connection" between the Defendants' prohibition of all mailed religious items and a legitimate governmental interest. This Court's standard for the government to pass the first prong is exceedingly low in the First Amendment context. For instance, in Pope v. Hightower, 101 F.3d 1382, 1385 (11th Cir. 1996), we easily held that a prison's restriction on telephone access had a rational connection to a legitimate governmental objective. The general goal of "[r]eduction of criminal activity and harassment" was a sufficient legitimate governmental objective, and "[t]he connection between that objective and the use of a ten-person calling list [was] valid and rational because it [was] not so remote as to render the prison telephone policy arbitrary or irrational." Id. (emphasis added). Likewise, despite the lack of evidence the Defendants offered here, prohibiting prisoners from receiving items from outside the prison does not have so remote a connection to the concerns about safety and resource allocation as to render the policy arbitrary or irrational.

Second, there is no genuine dispute about whether Mr. Davila has alternative means of practicing Santeria. In O'Lone, the Supreme Court rejected a prisoner's First Amendment challenge to a prison's restriction of his ability to attend Jumu'ah, a Muslim service at a specific time of day and day of the week, even though it admitted that there were "no alternative means of attending Jumu'ah."

28

482 U.S. at 351, 107 S. Ct. at 2406.  The Court went on to hold: "While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end."  Id. at 351–52, 107 S. Ct. at 2406.  Here, even though Mr. Davila has no alternative means of obtaining beads and shells with Ache, this showing is not enough for relief under the First Amendment.

Third, there is no genuine dispute that allowing prisoners to receive religious items from outside the prison would impact prison staff, other inmates, and the allocation of prison resources.  Again, in the First Amendment context, a prison need not show the extent to which a particular accommodation would impact resources, but instead only that it would have an impact.  As the Supreme Court has observed "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order."  Turner, 482 U.S. at 90, 107 S. Ct. at 2262.  Thus, regardless of whether the prison here has an existing system of processing items from outside the prison, allowing more items through that process would indisputably impact the use of the prison's resources.  Unlike RFRA, such a meager showing is all the First Amendment requires.

Finally, there is no genuine dispute about whether there are obvious, easy alternatives to the prison's policy prohibiting receipt of religious items from outside the prison. As the Court noted, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90–91, 107 S. Ct. at 2262. And any alternative must "fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." Id. at 91, 107 S. Ct. at 2262. The only alternative that would allow Mr. Davila to obtain his beads and shells is to permit prisoners to receive religious items from outside the prison, which would result in a more than "de minimis" cost to the prison's interests.

In short, the District Court correctly granted summary judgment to the Defendants on Mr. Davila's First Amendment claims. Since Mr. Davila has not established a First Amendment violation, we do not address his claims for money damages on that claim.

## VI. CONCLUSION

This Term, we expect to hear from the Supreme Court in a case similar to this one addressing the religious rights of prisoners under RLUIPA. See Holt v. Hobbs, No. 13-6827 (argued Oct. 7, 2014). Even in light of the ongoing developments in this area of the law, however, on this record—where the Defendants have failed to offer any evidence justifying their concerns about prison

30

safety and costs—a grant of summary judgment to the Defendants was in error.

We therefore **REVERSE** the District Court's grant of summary judgment on Mr.

Davila's claim for injunctive relief under RFRA, and **AFFIRM** the remainder of

the District Court's rulings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**