[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14341

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CLARE THERESE GRADY,
CARMEN TROTTA,
MARTHA HENNESSY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:18-cr-00022-LGW-BWC-3

_____

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

BRANCH, Circuit Judge:

In the late-night hours of April 4, 2018, Clare Grady, Martha Hennessy, Carmen Trotta, and several others associated with the Plowshares movement[1] surreptitiously and illegally entered the Naval Submarine Base Kings Bay in St. Marys, Georgia. Once inside the Kings Bay naval base, the defendants executed their plans to engage in religious protest of nuclear weapons by engaging in what they refer to as "symbolic disarmament." These actions, however, were far more than symbolic; in fact, they were incredibly destructive—spray painting numerous anti-nuclear and religious messages on the sidewalk and on monuments; pouring donated blood from the movement's members on the door of a building and the sidewalk; hammering on a decommissioned missile display; placing crime scene tape around the base; removing signage and part of a monument; and cutting through wiring and fencing in order to enter a highly secured area and display banners protesting nuclear

---

[1] The Plowshares Movement is a "Roman Catholic protest and activism group opposed to nuclear weapons." The movement's name comes from the Bible verse, Isaiah 2:4, which provides: "He will judge between the nations and will settle disputes for many peoples. They will beat their swords into plowshares and their spears into pruning hooks. Nation will not take up sword against nation, nor will they train for war anymore."

weapons.    Base security ultimately apprehended the group peacefully, and federal charges were brought against the involved individuals.    Grady, Hennessy, and Trotta proceeded to a jury trial, and now appeal their respective convictions and sentences for conspiracy, destruction of property on a naval installation, depredation of government property, and trespass.

Jointly, the trio argue that (1) the district court erred in denying their respective motions to dismiss the indictment under the Religious Freedom and Restoration Act ("RFRA"), and (2) the district court erred in holding them jointly and severally liable for the full restitution amount.

Additionally, Hennessy and Trotta jointly argue that (3) the district court abused its discretion when it denied their respective requests for a guidelines reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

Turning to their individual arguments, Hennessy argues that (4) the district court abused its discretion in increasing her offense level under U.S.S.G. § 2B1.1(b)(1)(C) when it treated the total damages amount as the loss amount.  And Grady argues that the district court erred in (5) not giving her requested mistake-of-fact jury instruction, and (6) failing to consider or address RFRA at sentencing.    After careful consideration and with the benefit of oral argument, we affirm.

## I.    Background

Naval Submarine Base Kings Bay is home to the only strategic weapons facility on the Eastern Seaboard and houses numerous submarines and critical assets.  The Kings Bay naval base is large, covering approximately 17,000 acres with 26 miles of perimeter fencing and employing approximately 10,500 people as part of the staff or crew.  The facility is highly secured, with only three authorized points of entry, which are manned at all times by armed guards.  The base area behind the perimeter fencing is not open to the general public.  Anyone who attempts to gain access to the base other than through the three main gates is trespassing, and guards are authorized to exercise deadly force against unauthorized entry or trespassers if necessary.

Other higher security areas within the perimeter fencing of the Kings Bay naval base are protected by additional barriers.  For instance, an area referred to as the "Limited Area" is separated from other areas of the base by double lines of fencing and concertina wire.[2]  Written warnings that deadly force may be used against intruders are posted along the fencing and an oral announcement to that effect is played over a loudspeaker

---

[2] Concertina wire is "an entanglement of coiled usually barbed wire that can be . . . use[d] as an obstacle."  Concertina wire, *Webster's Third New International Dictionary Unabridged* (2005), https://unabridged.merriam-webster.com/unabridged/concertina%20wire (last visited November 22, 2021).

approximately every eight to nine minutes. In addition to numerous buildings and other assets inside the base, there is a static missile display that showcases several decommissioned ballistic missiles.

And outside the gates of the naval base is a static submarine display known as the Bancroft Memorial. Several times a year, different groups request and receive permission from the Kings Bay naval base's Public Affairs Office to demonstrate or protest at the Bancroft Memorial. For instance, the group Pax Christi holds a candlelight vigil twice a year in protest of the operations on the base. And another group demonstrates around the anniversary of the Hiroshima and Nagasaki bombings.

In this case, however, the defendants did not request or receive permission to protest at the Bancroft Memorial site or anywhere else. Instead, after approximately two years of secret planning, under the cover of darkness on April 4, 2018, Grady, Hennessy, Trotta, and four other members of the Plowshares Movement equipped with spray paint, bolt cutters, hammers, blood, banners, crime scene tape, Go-Pro cameras, and other tools cut a padlock on the perimeter fencing of the Kings Bay naval base, opened a gate, and illegally entered the base. The group intended to engage in symbolic disarmament as part of their faith, which they profess requires them to "practice peaceful activism and prevent nuclear war." Once inside the Kings Bay naval base, the seven individuals split into groups and proceeded to different areas of the base, including the administration

6                    Opinion of the Court                    20-14341

building, the static missile display, and the nuclear weapons storage bunkers.

Grady and Hennessy went to the administration building where they spray-painted numerous anti-nuclear and religious messages on the sidewalk.  They poured bottles of human blood on the door of the building and sidewalk, and placed crime scene tape around the building.  They also taped an "indictment"[3] of the

---

[3] The indictment stated as follows:

KINGS BAY PLOWSHARES (PLAINTIFF),

VS.

UNITED STATES OF AMERICA (DEFENDANT),

INDICTMENT

Today, through our nonviolent action, we, Kings Bay Plowshares—indict the United States government, President Donald Trump, Kings Bay Base Commander Brian Lepine, the nuclear triad, and specifically the Trident nuclear program.

WHEREAS, This program is an ongoing criminal endeavor in violation of international treaty law binding on the United States under the supremacy clause of the U.S. Constitution (Article VI, Section 2): This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

WHEREAS, The United States is bound by the United Nation's Charter, ratified and signed in 1945. Its preamble affirms that its purpose is to "save future generations from the scourge of war." It directs that "all nations shall refrain from the use of force against another nation." Article II regards the threat to use nuclear weapons as ongoing international criminal activity.

WHEREAS, The Nuremberg Principles, also promulgated in 1945, primarily by the U.S., prohibit crimes against peace, crimes against humanity, war crimes and genocide. They render nuclear weapons systems prohibited, illegal, and criminal under all circumstances and for any reason.

WHEREAS, The U.S. government is obligated as well by the Non-Proliferation Treaty, in force since 1970 that requires the signers to pursue negotiations in good faith and to eliminate nuclear weapons at an early date. The U.S. government is also obligated by the Comprehensive Test Ban Treaty, which prohibits full-scale nuclear explosions.

WHEREAS, the members of the United Nations are currently negotiating a treaty to prohibit nuclear weapons, leading towards their total elimination.

THEREFORE, the work being . . . done at Kings Bay Naval Submarine Base violates all these agreements and is thus criminal.

. . .

Against these continuing violations of treaty law, we assert our right and duty to civil resistance against nuclear weapons. Furthermore, we affirm as crucial the human right to be free from these crimes. The Nuremberg Principles not only prohibit such crimes but oblige those of us aware of the

8                          Opinion of the Court                        20-14341

government to the door and left the book *Doomsday Machine, Confessions of a Nuclear War Planner* by Daniel Ellsberg at the building.  Grady and Hennessy then joined the others at the static missile display, where they hammered on the display, hung more crime scene tape, and spray-painted messages on the base of the display.  Other group members removed signage and part of a monument, poured more human blood, and spray-painted other monuments.[4]

---

crime to act against it.  "Complicity in the commission of a crime against peace, a war crime, or a crime against humanity . . . is a crime under International law".  The United Nations Charter further reinforced this principle and made it part of the binding international law.  Similarly, the Convention on the Prevention and Punishment of the Crime of Genocide, to which the United States is a signatory, makes it clear that private individuals can be held responsible for acts of genocide.

The ongoing building and maintenance of Trident submarines and ballistic missile systems constitute war crimes that can and should be investigated and prosecuted by judicial authorities at all levels.  As citizens, we are required by International Law to denounce and resist known crimes.

For the sake of the whole human family threatened by nuclear weapons, and for the sake of our Planet Earth, which is abused and violated, we indict the Kings Bay Naval Submarine Base and all government officials, agencies, and contractors as responsible for perpetuating these war crimes.

[4] The fact that Grady, Hennessy, and Trotta did not personally engage in these additional acts is not relevant because they are each "liable for any act

20-14341                Opinion of the Court                    9

Meanwhile, Trotta proceeded with other individuals to the highly secured "Limited Area" where they cut through fencing and concertina wire and entered the area. There they displayed banners protesting the morality of nuclear weapons and prayed.

After several hours, all seven individuals were apprehended peacefully by security. They all were subsequently indicted on charges of: (1) conspiracy, in violation of 18 U.S.C. §§ 371 and 2;[5] (2) destruction of property on a naval installation, in violation of 18 U.S.C. §§ 1363 and 2;[6] (3) depredation of government property, in violation of 18 U.S.C. §§ 1361 and 2;[7] and (4) trespass, in

---

done by a co-conspirator in furtherance of the conspiracy." *See United States v. Loyd*, 743 F.2d 1555, 1561 (11th Cir. 1984).

[5] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

[6] "Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act, shall be fined under this title or imprisoned not more than five years, or both, and if the building be a dwelling, or the life of any person be placed in jeopardy, shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1363.

[7] Section 1361 provides:

Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property

10                    Opinion of the Court                    20-14341

violation of 18 U.S.C. § 1382.[8]

As relevant to this appeal, Grady, Hennessy, and Trotta each filed virtually identical motions to dismiss the indictment, arguing that their prosecution violated RFRA. Specifically, they asserted that their actions at the Kings Bay naval base were "in accordance with their deeply held religious beliefs that nuclear weapons are immoral and illegal," and the government's prosecution of them substantially burdened their religious exercise in violation of RFRA. They maintained that, under RFRA, the government could not show that the decision to charge the defendants was the least-restrictive means of furthering its compelling interests in the safety and security of the base. Grady, Hennessy, and Trotta proposed the following less

---

which has been or is being manufactured or constructed for the United States, or any department or agency thereof, or attempts to commit any of the foregoing offenses, shall be punished as follows:

If the damage or attempted damage to such property exceeds the sum of $1,000, by a fine under this title or imprisonment for not more than ten years, or both; if the damage or attempted damage to such property does not exceed the sum of $1,000, by a fine under this title or by imprisonment for not more than one year, or both.

18 U.S.C. § 1361.

[8] "Whoever, within the jurisdiction of the United States, goes upon any military, naval, . . . post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . . Shall be fined under this title or imprisoned not more than six months, or both."  18 U.S.C. § 1382.

restrictive alternatives of achieving the government's compelling interest: (1) reducing the number and severity of the charges; (2) not prosecuting and offering instead civil injunctions, civil damages, community service, "ban and bar" letters, or pre-trial diversion; and (3) giving the defendants permission to practice symbolic disarmament in a designated area on the base. Thus, they argued that the indictment must be dismissed. The government opposed the motions.

Following a two-day evidentiary hearing, the district court denied their motions to dismiss. The district court held that Grady, Hennessy, and Trotta had established a *prima facie* case under RFRA because they had shown that their actions at the Kings Bay naval base were a sincere religious exercise and that the laws in question substantially burdened their religious exercise. The district court then explained that the government met its burden of demonstrating that it had a compelling interest in the (1) safety, (2) security, and (3) smooth operation of the naval base, naval base personnel, and naval base assets. Finally, the district court explained that the government met its burden of establishing that the application of the laws in question to each of the defendants was "the least restrictive means of furthering any one of th[o]se compelling government interests."

Grady, Hennessy, and Trotta proceeded to a jury trial and were convicted of all charges.

For sentencing purposes, the statutory maximum for the conspiracy offense was five years' imprisonment. *See* 18 U.S.C.

§ 371.  The statutory maximum for destruction of property on a naval installation was five years' imprisonment.  *See* 18 U.S.C. § 1363.  The statutory maximum for depredation of government property was 10 years' imprisonment.  *See* 18 U.S.C. § 1361. Finally, the statutory maximum for trespass was six months' imprisonment.  *See* 18 U.S.C. § 1382.  The district court sentenced Grady to a below-guidelines sentence of 12 months and one day imprisonment to be followed by three years of supervised release.[9]  Hennessy received a below-guidelines sentence of 10 months' imprisonment to be followed by three years of supervised release.[10]  And Trotta received a below-guidelines sentence of 14 months' imprisonment to be followed by three years of supervised release.[11]  The district court also imposed restitution in the amount of $33,503.51, for which each defendant was jointly and severally liable.

This appeal followed.

II.    Discussion

---

[9] Grady's advisory guidelines range was 21 to 27 months' imprisonment.

[10] Hennessy's advisory guidelines range was 15 to 21 months' imprisonment.

[11] Trotta's advisory guidelines range was 21 to 27 months' imprisonment.

20-14341                Opinion of the Court                13

A.    Whether the district court erred in denying the defendants'
motions to dismiss the indictment under RFRA

Grady, Hennessy, and Trotta argue that the district court
erred in denying their respective motions to dismiss the
indictment under RFRA.  They maintain that the government
failed to meet its burden to prove that criminal prosecution was
the least-restrictive means of achieving the government's
compelling interests, particularly in light of the defendants'
proposed alternative of permitting symbolic disarmament on a
designated area of the base.

"Generally, we review the district court's denial of a
motion to dismiss an indictment for abuse of discretion." *United
States v. Farias*, 836 F.3d 1315, 1323 (11th Cir. 2016).  However,
whether government action "comports with RFRA is a pure
question of law," which is subject to *de novo* review.  *Lawson v.
Singletary*, 85 F.3d 502, 511–12 (11th Cir. 1996).

RFRA provides the following protection against substantial
burdens on a person's religious exercise by the government:

(a) In general

Government shall not substantially burden a
person's exercise of religion even if the burden
results from a rule of general applicability, except as
provided in subsection (b).

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling government interest.

### (c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb-1. "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000bb-2(4), 2000cc-5(7)(A). Further, "the 'exercise of religion' under RFRA must be given the same broad meaning that applies under [the Religious Land Use and Institutionalized Persons Act]." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 n.5 (2014).

Thus, to establish a *prima facie* RFRA claim, a defendant must first show (1) that he or she was exercising (or was seeking to exercise) his or her sincerely held religious belief, and (2) that the government substantially burdened the defendant's religious

exercise. *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015). The burden then shifts to the government to demonstrate that (3) it has a compelling interest, and (4) the challenged action in question is the least-restrictive means of furthering that interest. *Id.* at 1205, 1207.

RFRA may be raised as a defense to criminal prosecution. *See* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."); *see also United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016) (explaining that RFRA may be invoked as a defense to a criminal prosecution); *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011) (same).

In this case, the parties agree that the defendants were exercising sincerely held religious beliefs, the government substantially burdened the defendants' religious exercise, and the government has a compelling interest. Accordingly, the fourth prong in the RFRA analysis is the only prong in dispute in this appeal—whether the government met its burden of demonstrating that criminal prosecution of the defendants was the least-restrictive means of furthering its significant compelling interests in the safety and security of the naval base, naval base personnel, and naval base assets. Grady, Hennessy, and Trotta maintain that their proposed alternative of permitting their religious exercise of "symbolic disarmament" in a designated area

is the least-restrictive means, and, therefore under RFRA, the indictment should have been dismissed.

> We thus turn to the scope of the government's burden.

> The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it.

*Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (alterations adopted) (quotations and internal citations omitted). In meeting its burden, the government must refute the alternative schemes proposed by the petitioners. *Smith v. Owens*, 13 F.4th 1319, 1326 (11th Cir. 2021); *see also Wilgus*, 638 F.3d at 1289 (explaining that, to meet its burden, the government "must refute the alternative schemes offered by the challenger"); *see also Christie*, 825 F.3d at 1061 ("At a minimum, the government must address those alternatives of which it has become aware during the course of this litigation," and "must show that each proposed alternative either is not 'less restrictive' within the meaning of RFRA, or is not plausibly capable of allowing the government to achieve all of its compelling interests.").[12]

---

[12]  To the extent that Grady argues that the government was required to proffer less restrictive alternatives and failed to do so, she is wrong. The

20-14341                Opinion of the Court                17

Pointing to permitted protests of other groups at the naval base, the defendants proposed that a less restrictive alternative would be for the naval base to make arrangements for them to practice symbolic disarmament in a designated area (an option that they did not pursue prior to entering the naval base). In offering this alternative, the defendants attempt to recast their religious exercise as merely requiring them to be on base property such that their religious exercise could be accommodated by the Kings Bay naval base in the same way that candlelight vigils and other religious exercises are accommodated for other groups.

Their argument for this alternative is misplaced. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006), the Supreme Court explained that, in enacting RFRA, "Congress has determined that courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular [religious] practice at issue." *See also Holt*, 574 U.S. at 361–62 (explaining that "RLUIPA's 'substantial burden inquiry' asks whether the government has substantially burdened" the particular religious exercise in question, "not whether the RLUIPA claimant is able to

government does not bear the burden of proffering less restrictive alternatives or demonstrating that it actually considered and rejected those alternatives. *See Smith*, 13 F.4th at 1326; *Knight v. Thompson*, 797 F.3d 934, 946–47 (11th Cir. 2015).

engage in other forms of religious exercise"). Here, because the defendants were seeking relief from prosecution for past religious practice, "the particular practice at issue" for purposes of the RFRA analysis is necessarily the religious practices engaged in by the defendants on April 4, 2018. In other words, the district court had to determine whether an exemption under RFRA could be granted for the particular religious exercises engaged in on April 4, 2018. *See id.* Thus, neither the district court nor this Court could consider whether lesser restrictive alternatives were available for the Plowshares group to protest in a different manner than the destructive manner in which they did in the late night hours of April 4, 2018.

Instead, in order to be a viable least-restrictive means for purposes of RFRA, the proposed alternative needed to accommodate both the religious exercise practiced in this case— unauthorized entry onto the naval base and destructive actions, including spray painting monuments, doors, and sidewalks, pouring human blood on doors and other areas, hammering on a static missile display, hanging banners and crime scene tape, as well as removing and partially destroying signage and monuments around the naval base—and simultaneously achieve the government's compelling interests in the safety and security of the naval base, naval base assets, personnel, and critical operations. *Christie*, 825 F.3d at 1061.

The defendants, however, failed to proffer a least-restrictive means that would simultaneously accommodate their

20-14341                Opinion of the Court                19

religious exercise while protecting the government's compelling interests. Permitting the defendants to practice symbolic yet destructive disarmament in a designated area would not be an effective means of achieving the government's interest in the safety and security of the naval base's assets. Their "symbolic" disarmament would still damage naval base property and assets. Because this alternative does not achieve all the government's compelling interests, it is not a viable least-restrictive means. *See Knight*, 797 F.3d at 945 (holding that plaintiffs' RLUIPA claim failed because the plaintiffs' proposed alternatives to the prison's short-hair policy for male inmates—including allowing an exemption for certain inmates, requiring inmates to search their own hair, and using a computer program to alter inmate photographs—did not eliminate the stated security, discipline, hygiene, and safety concerns).

Simply put, RFRA is not a "get out of jail free card," shielding from criminal liability individuals who break into secure naval installations and destroy government property, regardless of the sincerity of their religious beliefs. Just as "no Supreme Court case supports the destruction of government, or another's, property on free exercise grounds," *United States v. Allen*, 760 F.2d 447, 452 (2d Cir. 1985), nothing in RFRA supports destructive, national-security-compromising conduct as a means of religious exercise.

The defendants' comparison of their case to that of *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *United States v.*

*Hoffman*, 436 F. Supp. 3d 1272 (D. Ariz. 2020), is unpersuasive.  In *Yoder*, a First Amendment Free Exercise Clause case, the Supreme Court affirmed the Wisconsin Supreme Court's decision overturning Amish parents' convictions for violating the state's compulsory school attendance law based on the Free Exercise Clause.  406 U.S. at 207.  The Court explained that schooling beyond the eighth grade was contrary to the Amish faith, and the state's facially neutral compulsory attendance law "severe[ly]" burdened the practice of the Amish religion—it compelled the Amish, "under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 210–11, 218, 220–21.  The Court held that the State failed to meet its burden of showing how its interest in educating citizens so that they could participate effectively and intelligently in society would be adversely affected by granting an exemption to the Amish—particularly considering the Amish's alternative mode of informal vocational education beyond the eighth grade. *Id.* at 222–229, 235–36.  In other words, the State failed to show that its asserted compelling interest could not be achieved with an exception to the compulsory education law for the Amish.

And in *Hoffman*, members of "No More Deaths," a faith-based humanitarian aid organization associated with the Unitarian Universalist Church, entered a wildlife refuge without a permit, drove on a restricted-access road, and left food, water, and other supplies along foot trails frequently used by persons entering the United States unlawfully, in an effort to prevent

20-14341            Opinion of the Court            21

deaths from dehydration and exposure. 436 F. Supp. at 1276–77. As a result of their actions, the members of the group were criminally charged with entering the wildlife refuge without a permit, abandoning property, and driving in a wilderness area, in violation of several regulations. *Id.* at 1278. They raised a RFRA defense at a bench trial before a magistrate judge but were convicted as charged. *Id.* On appeal, the district court reversed their convictions based on RFRA. *Id.* at 1283–89. Specifically, the district court found that the government failed to demonstrate that prosecution was the least-restrictive means of achieving its environmental interests in the refuge because it did not show why allowing the defendants' practice so long as they picked up any trash would not achieve the government's interest. *Id.* at 1289.

Unlike the situations presented in *Yoder* and *Hoffman*, however, as explained previously, it would be impossible to achieve all of the government's compelling interests in the safety and security of the Kings Bay naval base, its base personnel, and its base assets and also accommodate the defendants' destructive religious exercise in this case. The need for the uniform application of laws prohibiting unauthorized entry on naval base property, as well as the depredation and destruction of naval base assets, are the least-restrictive means of achieving the government's compelling interest in national security—an interest of the highest order—and precludes the recognition of the proposed exceptions to these criminal laws, even under RFRA. *See, e.g.*, *O Centro*, 546 U.S. at 436 ("We do not doubt that there

22                    Opinion of the Court                    20-14341

may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA."); *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005) ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests."); *United States v. Lee*, 455 U.S. 252, 260 (1982) (holding, in a pre-RFRA context, that "[b]ecause the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax"); *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("[T]he freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions."). Accordingly, the district court did not err in denying the defendants' motions to dismiss the indictment.

## B. Whether the district court erred when it held the defendants jointly and severally liable for the full amount of restitution

Grady, Hennessy, and Trotta argue that the district court erred in holding them jointly and severally liable for the full amount of the ordered restitution—$33,503.51.[13] They maintain

---

[13] The government contends that only Hennessy and Trotta make this argument, but this contention ignores Grady's statement of adoption in her brief.

that the district court should have made findings as to the damage caused by their respective individual actions and held them each personally liable for only that amount. We disagree.

"We review *de novo* the legality of an order of restitution, but review for abuse of discretion the determination of the restitution value of lost or destroyed property. We review for clear error factual findings underlying a restitution order." *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007) (quotation and internal citations omitted); *cf. United States v. Alas*, 196 F.3d 1250, 1251 (11th Cir. 1999) (reviewing imposition of joint and several liability for restitution for an abuse of discretion).

The Mandatory Victims Restitution Act provides that the district court "shall order" restitution for certain offenses, including "an offense against property under [Title 18]," like the offenses in this case. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A). Section 3664 sets forth the procedures for ordering restitution and provides that the district court "shall order restitution to each victim in the full amount of each victim's losses as determined by the court." *Id.* § 3664(f)(1)(A). Moreover,

> [i]f the court finds that more than 1 defendant has contributed to the loss of a victim, **the court may make each defendant liable for payment of the full amount of restitution** or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

*Id.* § 3664(h) (emphasis added).  Accordingly, "a district court does not exceed its authority by ordering a defendant to pay restitution for losses which result from acts done in furtherance of the conspiracy of which the defendant is convicted." *United States v. Obasohan*, 73 F.3d 309, 311 (11th Cir. 1996); *see also United States v. Davis*, 117 F.3d 459, 462–63 (11th Cir. 1997) (concluding that the district court did not err in holding the defendants jointly and severally liable for the full amount of the losses because the defendants had substantial involvement in the fraud scheme that caused the losses and "a defendant is liable for reasonably foreseeable acts of others committed in furtherance of the conspiracy for which the defendant has been convicted").

Here, the losses in question resulted from acts which were part of the conspiracy of which Grady, Hennessy, and Trotta were convicted.  Therefore, the district court had the authority to hold them jointly and severally liable for the full amount of restitution.   18 U.S.C. § 3664(h); *Obasohan*, 73 F.3d at 311.  Accordingly, the district court did not abuse its discretion or otherwise err in holding the defendants jointly and severally liable for the full amount of the restitution.

## C.    Whether the district court erred in denying a reduction for acceptance of responsibility for Hennessy and Trotta

Hennessy and Trotta argue that the district court abused its discretion when it denied their respective requests for acceptance-of-responsibility reductions under U.S.S.G. § 3E1.1.   They maintain that they never denied engaging in the conduct in

question and went to trial only because of their RFRA defense. Thus, they argue that, under these circumstances, they are each entitled to a reduction for acceptance of responsibility.

"We review the district court's determination of acceptance of responsibility only for clear error. [The] determination that a defendant is not entitled to acceptance of responsibility will not be set aside unless the facts in the record clearly establish that a defendant has accepted personal responsibility." *United States v. Amedeo*, 370 F.3d 1305, 1320–21 (11th Cir. 2004) (quotation and internal citation omitted); *see also United States v. Andres*, 960 F.3d 1310, 1318 (11th Cir. 2020) (same).

U.S.S.G. § 3E1.1(a) instructs the district court to decrease a defendant's base offense level by two if he "clearly demonstrates acceptance of responsibility for his offense." The commentary to the Guidelines indicates that this reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1(a), cmt. (n.2). "[T]he reduction is intended to reward defendants who express contrition for their wrongdoing and evidence a desire to reform their conduct." *Andres*, 960 F.3d at 1318 (quotation omitted).

Nevertheless, the commentary notes that a "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction," although such instances in

which the reduction would still be appropriate will be "rare." U.S.S.G. § 3E1.1(a), cmt. (n.2).  For instance, a defendant may still be eligible for the reduction "where [he] goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).    Under those circumstances, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."  *Id.*  Because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility . . . the determination of the sentencing judge is entitled to great deference on review."  *United States v. Williams*, 408 F.3d 745, 757 (11th Cir. 2005) (quoting U.S.S.G. § 3E1.1, cmt. (n.5)).

In denying the reduction for Hennessy and Trotta, the district court found that neither defendant had clearly demonstrated acceptance of responsibility because they continued to deny the illegality of their actions and put the government to its burden of proof.  This finding was not clearly erroneous and is supported by the record.

Prior to trial, the defendants filed notices of intent to present a RFRA defense at trial to which the government objected.  The district court sustained the government's objection and held that it had already addressed the RFRA issue in denying the defendants' motions to dismiss the indictment, and the defendants could not relitigate it before the jury.  At trial, while

the defendants did not deny that they engaged in the conduct in question, they denied that their actions constituted crimes, and their statements throughout the district court proceedings demonstrated a willingness to continue to engage in such conduct.[14]   In other words, after their effort to challenge the applicability of the criminal statutes to their conduct proved unsuccessful, the defendants then proceeded to a multi-day jury trial and put the government to its burden of proof.   The defendants cannot argue that they proceeded to a jury trial in order to continue to challenge the applicability of the criminal statutes to their allegedly religious conduct, because they were not permitted to raise a RFRA defense at trial.   While each

---

[14] For instance, at the hearing on the motion to dismiss the indictment, Trotta testified that the group would not have hesitated to destroy nuclear-related hardware and was "disappointed" that they did not encounter a submarine while on the base, and that if they had, they would not have hesitated to engage in further symbolic disarmament and "transform it." Later, at his sentencing, Trotta asserted that all of his criminal history is for acts in opposition to "American war crime[s]" and indicated that "what our country needs desperately is for a great deal more resistance to its ongoing foreign policy which is a threat to the globe and not merely through nuclear weapons, but even through simply the ongoing wars." Similarly, following the jury's guilty verdict, Hennessy made a statement to the media outside the courthouse implying that she was willing to continue to engage in this type of conduct again stating, "[t]he efficiency of the state can never be underestimated; yet, we proceed in humility.  The weapons are still there. The treaties are being knocked down one after the next. But we are called to keep trying, and we will do this together.  We have no other choice."

defendant has a constitutional right to a jury trial, under the circumstances in this case, the exercise of that right was inconsistent with the reduction for acceptance of responsibility. *Andres*, 960 F.3d at 1318. Accordingly, this is not one of those "rare" instances in which the record clearly establishes that the defendant accepted responsibility and should receive a reduction despite putting the government to its burden of proof at trial.

Moreover, we note that, at sentencing, the district court stated that, "regardless of how the guidelines objections had come out," it would have imposed the same sentence for both Hennessy and Trotta. Accordingly, any alleged error in failing to award Hennessy and Trotta reductions for acceptance of responsibility was harmless. *See United States v. Keene*, 470 F.3d 1347, 1348–49 (11th Cir. 2006) (holding that a guidelines error is harmless if the district court unambiguously expressed that it would have imposed the same sentence, regardless of the guidelines calculation).

D.    **Whether the district court erred when it used the total damages amount to enhance Hennessy's base offense level under U.S.S.G. § 2B1.1(b)(1)(C)**

Hennessy argues that the district court abused its discretion when it used the total loss amount of $33,503.31 to increase her base offense level under U.S.S.G. § 2B1.1(b)(1)(C). She maintains that the government failed to present any evidence of the loss

amount at sentencing, and because it was her first Plowshares action,[15] the record does not support the conclusion that the acts of her codefendants were reasonably foreseeable to her. Therefore, she argues that only the loss caused by her specific actions should have been attributed to her.

The district court's interpretation of the Guidelines and the application of the Guidelines to the facts are reviewed *de novo*. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). When the government seeks to apply an enhancement under the Sentencing Guidelines over the defendant's factual objection, the government has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence. *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013). "The district court is permitted to base its loss determination on factual findings derived from, among other things, evidence heard during trial, undisputed statements in the

---

[15] Although the events at the Kings Bay naval base may have been Hennessy's first Plowshares-related action, like her codefendants, Hennessy was no stranger to protests and similar demonstrations. Hennessy, who is in her 60s, described herself at the evidentiary hearing as a nonviolent "anarchist[]," and admitted that she had been arrested (but never convicted) numerous times dating back to 1979 for her protest-related activities in opposition to nuclear power plants and Guantanamo Bay. When asked to estimate how many times she had been arrested, she stated "not enough times"—although we note that according to her PSI, she was arrested 16 times between 2008 and 2018 alone.

[presentence investigation report ('PSI')], or evidence presented during the sentencing hearing." *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011) (quotation omitted).

U.S.S.G. § 2B1.1 applies to offenses involving property damage or destruction. *See* U.S.S.G. § 2B1.1. It directs the court to increase the offense level by four if the loss exceeded "more than $15,000" but was less than $40,000. *Id.* § 2B1.1(b)(1)(C). The commentary further provides that "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id.* § 2B1.1 cmt. (n.3(C)).

Because Hennessy's convictions were based upon her participation in a criminal conspiracy, relevant conduct under the Guidelines included "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). To determine what acts of other co-conspirators are reasonably foreseeable to a defendant, the court must engage in a two-prong analysis. *United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004). First, the court must determine the "scope of criminal activity the defendant agreed to jointly undertake." *Id.* Then, the court must "consider all reasonably

20-14341                Opinion of the Court                    31

foreseeable acts and omissions of others in the jointly undertaken criminal activity." *Id.* (quotation omitted).

The evidence at trial established that Hennessy helped plan the actions at the Kings Bay naval base with the other Plowshares members for over two years. And on the night in question, she went to the naval base with the group knowing that they were armed with bolt cutters, a pry bar, spray paint, bottles of human blood, and other tools. Although she contends that she had no way of knowing what specific actions her codefendants would use those tools for once on the naval base, given her knowledge of the overall plan to conduct symbolic yet destructive disarmament, the district court did not err in determining that the acts of her codefendants were reasonably foreseeable to Hennessy. Accordingly, the district court did not err in holding her accountable for the entire loss amount when imposing the U.S.S.G. § 2B1.1 enhancement.[16]    *Bradley*, 644 F.3d at 1290; *McCrimmon*, 362 F.3d at 731.

---

[16] Hennessy also argues that the district court's determination of the loss amount was improper in light of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), in which the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Hennessy was sentenced to 10 months' imprisonment, which is well below the statutory maximum—a total of 20.5 years—and, therefore, *Apprendi* has no application here. Moreover, Hennessy's assertion that the loss amount had to be submitted to a jury and

E.      Whether the district court erred in failing to address Grady's RFRA-related sentencing argument

At sentencing, Grady argued that RFRA must be considered in the context of the 18 U.S.C. § 3553(a) factors when determining the appropriate sentence.  The district court then imposed a below-guidelines total sentence of 12 months and one day imprisonment to be followed by three years of supervised release, citing Grady's health issues as a reason for the lesser sentence.  When asked whether she had any objections, Grady stated that she did not.  [*Id.* at 95–96]  However, now on appeal, Grady argues that the district court failed to address her argument that RFRA must be considered in the context of the § 3553(a) factors.  She acknowledges, however, that "a body of law upon which this argument rests has not been specifically developed as yet."

When, as here, a defendant fails to object to an alleged sentencing error before the district court, we review for plain

---

proven beyond a reasonable doubt to avoid the constitutional concerns associated with judicial factfinding as articulated in *Apprendi* is squarely foreclosed by this Court's precedent.  *See United States v. Dudley*, 463 F.3d 1221, 1228 (11th Cir. 2006) (holding that there is no error under *Apprendi* when the defendant is not sentenced beyond the statutory maximum and "district courts may still impose fact-based sentencing enhancements under an advisory guidelines system without violating the Sixth Amendment").

error. *See United States v. Rodriguez*, 627 F.3d 1372, 1377 (11th Cir. 2010).  To establish plain error, a defendant must show that there was an "(1) error, (2) that is plain and (3) that affect[ed] [her] substantial rights.  If all three conditions are met, [we] may then exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007) (quotation omitted).  "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).  Accordingly, Grady cannot establish plain error because, as she acknowledges, no precedent exists at this time that instructs district courts to consider RFRA at sentencing.

F.     Whether the district court abused its discretion in failing to give Grady's requested mistake-of-fact jury instruction

At trial, Grady requested that the district court instruct the jury as to mistake of fact.[17]  Specifically, she argued that she had

---

[17] Grady requested the following jury charge:

> An honest mistake of fact is a complete defense to the charge in the indictment because it is inconsistent with the existence of willfulness, which is an essential part of the charge.

offered evidence that she possessed an "honest belief" that she was "acting lawfully" based on her sincerely held religious belief that nuclear weapons "are indeed immoral," and if the jury were to believe that the government was correct that nuclear weapons are essential to national security and lawful, then she would be mistaken—consistent with a mistake of fact instruction. In other words, she asserted that the government's position and her position cannot both be right—one has to be mistaken—and if hers was incorrect then she should get the benefit of a mistake-of-fact instruction because she honestly believed that her actions were lawful and that she was "uphold[ing] the highest law." The district court denied this request, concluding that the instruction was "not an appropriate statement of the law for this case." On appeal, Grady argues that the denial of this instruction was an abuse of discretion and because she possessed an honest belief that her actions were lawful, she could not be convicted of willful criminal conduct.

---

> Such an honest mistake negates the criminal intent of a defendant when the defendant's acts would be lawful, if the facts were as she supposed them to be. The burden of proof is not on the Defendant to prove her honest belief of a mistaken fact, since she has no burden to prove anything.
>
> A defendant whose actions are based on her honest belief that she was acting lawfully is not chargeable with willful criminal conduct-even if her belief was erroneous or mistaken.

"A criminal defendant has the right to have the jury instructed on her theory of defense . . . .  A trial court may not refuse to charge the jury on a specific defense theory where the proposed instruction presents a valid defense and where there has been some evidence adduced at trial relevant to that defense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995) (quotations and internal citations omitted).  "We review a district court's refusal to give a requested jury instruction for abuse of discretion."  *United States v. Gumbs*, 964 F.3d 1340, 1347 (11th Cir. 2020) (quotation omitted).

> A district court abuses its discretion if the requested instruction was a correct statement of the law, the subject matter of the instruction was not substantially covered by other instructions, and the instruction dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself.

*Id.* (alteration adopted) (quotation omitted).  Here, the district court did not abuse its discretion in declining to give the mistake-of-fact instruction.

To prove destruction of government property on a naval installation, the government had to prove beyond a reasonable doubt that Grady (1) willfully and maliciously; (2) destroyed or injured (or attempted to destroy or injure); (3) any structure, conveyance, or other real or personal property; (4) located within the special maritime and territorial jurisdiction of the United States.  *See* 18 U.S.C. § 1363.  Similarly, to prove depredation of

government property, the government had to prove that Grady (1) willfully; (2) injured and committed a depredation; (3) against United States property; (4) which resulted in over $1,000 dollars of damage. *See id.* § 1361. In both instances, the word "willfully" refers to consciousness of the conduct in question. In other words, the government had to prove that Grady acted consciously and deliberately, not that she knew or believed her actions were illegal. *See United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002) (rejecting similar argument to Grady's and holding that "[d]estroying other people's property is *malum in se*, and thus is willful provided only that the defendant knows that he's destroying another person's property without the person's authorization"); *United States v. Kelly*, 676 F.3d 912, 919 (9th Cir. 2012) (holding that a defendant violates § 1363 "when he willfully acts, intending to destroy or injure any such property, and has no legal justification or excuse for his action").

There is no question that Grady acted consciously and deliberately. The fact that she honestly believed her actions were lawful because of her personal views on nuclear weapons is irrelevant. *See Kelly*, 676 F.3d at 919 ("[E]ven defendants who genuinely believe that their intentional, unlawful actions are consistent with 'the conscience of the people,' as appellants put it, are guilty."); *United States v. Moylan*, 417 F.2d 1002, 1009 (4th Cir. 1969) (holding that "the law does not allow the seizure of public records and their mutilation or destruction, even when this is done as an act of conscience to dramatize the protest of a

presumed evil"); *see also Heien v. North Carolina*, 574 U.S. 54, 67 (2014) ("[A]n individual generally cannot escape criminal liability based on a mistaken understanding of the law."). Rather, as the Fourth Circuit emphasized in *Moylan* when confronted with a similar argument:

> From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed. Faced with the stark reality of injustice, men of sensitive conscience and great intellect have sometimes found only one morally justified path, and that path led them inevitably into conflict with established authority and its laws. Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards

38                        Opinion of the Court                    20-14341

does not carry with it legal justification or immunity from punishment for breach of the law.

The defendants' motivation in the instant case— *the fact that they engaged in a protest in the sincere belief that they were breaking the law in a good cause—cannot be acceptable legal defense or justification*. Their sincerity is beyond question. It implies no disparagement of their idealism to say that society will not tolerate the means they chose to register their opposition to the war. If these defendants were to be absolved from guilt because of their moral certainty that the war in Vietnam is wrong, would not others who might commit breaches of the law to demonstrate their sincere belief that the country is not prosecuting the war vigorously enough be entitled to acquittal? Both must answer for their acts.

417 F.2d at 1008–09 (emphasis added); *see also United States v. Douglass*, 476 F.2d 260, 262–64, 264 n.7 (5th Cir. 1973) (citing *Moylan* with approval and rejecting defendant's argument that he did not "willfully" violate 26 U.S.C. § 7603 by refusing to file taxes because he believes the IRS is unconstitutional and that voluntary payment of taxes is treason, concluding that it is not a defense that his act was done in protest of government policies). Accordingly, because mistake of fact was not a valid defense in this case, the district court did not abuse its discretion in declining to give the requested jury instruction.

### III.    Conclusion

Because Grady, Hennessy, and Trotta are not entitled to relief on any of their claims, we affirm their convictions and sentences.

**AFFIRMED.**