**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13478
Non-Argument Calendar
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JONATHAN DAVID GRENON,
JORDAN PAUL GRENON,

*Defendants-Appellants.*

JOSEPH TIMOTHY GRENON,

*Defendant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20242-CMA-2
_____

Before JORDAN, LUCK, and KIDD, Circuit Judges.

PER CURIAM:

Brothers Jonathan and Jordan Grenon[1] sold bottles of "Miracle Mineral Solution" as a cure-all capable of treating conditions like cancer, autism, and even the coronavirus.  In reality, the brothers were selling toxic bleach.  After a civil proceeding, the brothers were ordered to stop selling the solution, but they ignored that order.  The brothers were then charged and convicted for conspiracy and criminal contempt, which they now appeal.  We affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The "Miracle Mineral Solution" the brothers had been selling contained sodium chlorite.  They sold the product through an organization called the Genesis II Church of Health and Healing.  When mixed with an activator, as the label instructed, sodium chlorite becomes chlorine dioxide, otherwise known as bleach.  In early July 2020, the brothers were arrested in the Middle District of Florida and brought before a magistrate judge for an initial appearance.  The complaint charged the brothers, along with their father and a third brother, with one count of conspiracy to defraud the United States, and two counts of criminal contempt.

Because the brothers bring six arguments on appeal, we divide the remainder of the factual and procedural history to mirror the issues as they will follow in the discussion.

---

[1] Because the appellants share the same last name, we refer to them collectively as the brothers and individually by their first names.

*Pro Se Representation*

At the initial appearance, Jonathan told the magistrate judge that he was "going to be pro se." Jordan first asked, "[i]s this only for this meeting?" The magistrate judge explained that Jordan could later change his mind. Jordan then confirmed he was "pro se until further notice." The magistrate judge told the brothers that a federal public defender was available to assist and informed the brothers of: their right to counsel; the maximum sentence they faced; the pitfalls of self-representation; the rules that govern the district court; and how a trained lawyer could benefit the brothers' defense. The brothers confirmed they wished to proceed pro se, and the magistrate judge found the brothers knowingly and voluntarily waived their right to counsel.

At the brothers' detention hearing the next day, the magistrate judge noted the presence of a federal public defender available to assist, but the brothers refused to speak with him. The magistrate judge asked the brothers to let her know if they changed their minds and the brothers confirmed they would. The brothers' case was then transferred to the Southern District of Florida.

In its order denying the brothers' motion to dismiss, the district court noted the motion's "bizarre contents" and directed the government to "indicat[e] whether it will be seeking psychiatric or psychological examinations." The government responded that it was not seeking competency evaluations at that time. The district court then appointed the brothers standby counsel and held another *Faretta* hearing. After discussing with the brothers the skills

required for self-representation—along with its pitfalls—the district court found the brothers capable of representing themselves.

More than a year passed as the brothers awaited the other two codefendants' extradition from Colombia. Shortly after the final extradition, the brothers filed requests to be appointed counsel. The magistrate judge held a hearing on the brothers' request. Counsel was appointed at Jordan's hearing. At Jonathan's hearing, he refused to answer the magistrate judge's financial questions, and the magistrate judge ordered a follow-up hearing to occur the next month.

At the follow-up hearing, Jonathan told the magistrate judge he "will need 30 to 60 days to accomplish obtaining counsel." The magistrate judge then asked, "you do [not] want me to appoint you a lawyer at this point?" Jonathan responded, "[a]t this point I [am] trying to accomplish that myself." The magistrate judge warned Jonathan that the trial date was fast approaching and that it may be difficult to find a lawyer who could prepare in time. With those concerns in mind, the magistrate judge bluntly said, "let me appoint you a lawyer." Jonathan replied, "[n]o. I'm going to continue, myself, exhausting my administrative remedies." The magistrate judge set another hearing for the following month.

Meanwhile, the district court reviewed the docket and found the brothers' motions for appointment of counsel had been filed by an unauthorized third party and denied Jonathan's still-pending motion. Jordan's counsel then moved to withdraw at Jordan's request. After yet another *Faretta* inquiry, the district court granted

counsel's motion to withdraw.  By the next status conference, the brothers returned to stating unequivocally they no longer wished to be represented by counsel.

The Friday before the trial was set to begin, the district court held one final status conference where it asked, "[d]o any of you wish to have counsel appointed to represent you in this case?"  The brothers refused to answer.  The district court asked the same questions and provided the same warnings about self-representation that the magistrate judge had when the brothers made their first appearance, and the brothers refused to respond.  During the trial the brothers chose to remain silent throughout.

### Speedy Trial

Returning to the brothers' initial appearance in early July 2020, the magistrate judge ruled the brothers would remain detained pending trial.  The case was then transferred to the Southern District of Florida, where the offense was alleged to have been committed.  The brothers were indicted and arraigned at the end of April 2021—the government had been awaiting the extradition of two codefendants but decided to move forward with the brothers' indictments.

The district court set a trial date for the end of September 2021.  A month later, the government moved for a continuance, citing the administrative difficulty of extraditing the codefendants from Colombia.  At a hearing, the government noted that its Colombian counterparts said it takes approximately one year to process an extradition.  The brothers demanded the indictment be

dismissed—primarily reasserting sovereign-citizen arguments from an earlier motion—but the brothers did not directly comment on whether they opposed a continuance. The district court made an ends-of-justice finding on the record and issued an order continuing the trial until March 2022. In December 2021, the third brother was extradited and had his initial appearance.

Then, in January 2022, the government filed its second motion to continue the trial. At a hearing, the government explained that, while it did take approximately a year to extradite the third brother, a different Colombian judge had been handling the father's extradition request and that judge retired, which was slowing down the process. It is difficult to decipher whether the brothers opposed the continuance. Much of the hearing involved the brothers accusing the court of, among other things, committing barratry, slavery, peonage, and press-ganging for failing to dismiss the indictment. Jonathan also claimed the proceedings were "a conspiracy against my family" and noted "[t]he Lord will take vengeance on his adversaries and reserve his wrath for his enemies." But, interwoven between these claims, Jonathan did appear to oppose the continuance, saying that it was "just a way to keep extending and extending time." The district court again made an ends-of-justice finding on the record and issued an order continuing the trial until September 2022.

In July 2022, the final codefendant was finally extradited and arraigned. At a status conference a few days later, the government said that it was ready for trial. When the district court asked the

23-13478            Opinion of the Court            7

brothers if they had an opinion on the trial date, the brothers expressed none. Three days later, the district court, on its own, ordered competency evaluations for all four defendants. The government then moved for a third continuance, noting the bureau of prisons could not complete the competency evaluations in time for the trial. The district court granted the motion, again finding the ends of justice supported the continuance, and scheduled the trial for January 2023.

In late August 2022, the brothers moved to dismiss, taking issue with the competency evaluations and claiming their speedy-trial rights had been violated. The district court denied Jordan's motion because it was filed pro se and he was represented by counsel at the time. It denied Jonathan's motion, finding only excludable time had passed. Two months later, the brothers filed nearly identical motions. The district court again denied Jordan's motion because he was represented by counsel.

In November, two days after the defendants had been found competent to stand trial, the district court held another status conference. There, Jonathan told the district court he was "in the process of trying to acquire effective counsel." The district court noted the brothers had sought to dismiss the indictment due to delay and asked "[s]o how long are we going to wait?" Jonathan replied, "I [have] not exhausted my administrative remedies." Later in the hearing, the district court denied Jonathan's motion because he was responsible for delaying the trial due to his late-breaking request to find counsel. At that same hearing, Jordan asked to fire

the federal public defender representing him and find his own counsel. The district court replied that he could, "like [his] brother, continue searching for one until you find one." It then ruled it was "going to make a finding that all of these delays to the scheduling of the trial are being caused" by the brothers. The district court found the brothers' stance on counsel made it so they would "not be ready to proceed to trial as presently scheduled," continued the trial and set a new trial period beginning in July 2023. The trial began on July 17, 2023.

*Religious Freedom Restoration Act*

The brothers invoked religious concepts throughout the proceedings. Starting as early as the brothers' first appearance, Jonathan proclaimed that "the First Amendment is being broken," that "chlorine dioxide . . . is [their] sacrament," and that the proceedings were "totally against [their] religious rights."

Later, the brothers filed their first motion to dismiss. Much of that document is hard to decipher and claims the brothers are "vessels," and the United States government is an illegitimate "[d]e [f]acto [g]overnment" whose "[c]orporate [b]y-laws" do not apply to "G-d fearing sons" like them. The motion also claimed "[t]hat [their] [r]eligious freedoms have been violated," which was "[a]ll d[ue] to [p]olicies of the [Food and Drug Administration] unlawfully issued by someone an employee Ms. Dix ([n]ot [a]ppointed or [n]ot elected)." The district court denied the motion to dismiss.

Shortly before trial, the government filed a motion in limine seeking to preclude the brothers from pursuing a defense based on

the Religious Freedom Restoration Act. The district court granted the motion to the extent that it sought to preclude the brothers from putting the issue to the jury. But the order explained that the Act's applicability was a pure question of law the brothers had not raised and that if the brothers wished to raise it they would need to bring a motion to dismiss. The brothers never did.

After opening statements at trial, the district court instructed the jury that the First Amendment was not a defense to the charged conduct. During its case-in-chief, the government presented evidence that the Genesis II Church of Health and Healing was a "nonreligious church." The organization was structured this way "[t]o get around [g]overnment regulation and to not go to jail." The government pointed to the organization's newsletter from around the time of its founding that proclaimed: "[s]o here it is, we are forming a church of health and healing. Now, that [is] not religion, that [is] health and healing." The organization continued, "[d]o you understand the power that a church has that has [not] given up its power? Look at the Catholics. Their priests have been molesting women and children for centuries and the governments have not been able to stop it. If handled properly, a church can protect us." The brothers never invoked the Act at trial.

*Deference to Agency Interpretation*

The indictment referenced federal regulations. In the "Regulatory Framework" section of the indictment, after reciting the statutory definition of "drug," which focuses on the substance's "intended use," the indictment noted that a regulation, 21 C.F.R.

section 201.128, defined "intended use." At trial, the government expert testified about the terms in the indictment.

The district court's jury instructions explained that "[a] product's intended use is what a reasonable person would conclude the manufacturer or seller intended based on all the relevant information." The instructions clarified that a jury could determine a product's intended use by "considering the label, accompanying labelling, promotional material, advertising, oral representations made about the product, the circumstances surrounding the distribution of the article and information from any other source which discloses intended use." The brothers did not object to the regulatory framework section of the indictment, the expert's testimony, or the jury instructions.

## Jury Trial

At the calendar call before trial, the government said that it would be introducing the temporary restraining order and preliminary injunction that were issued against the brothers in the civil proceeding. There, the government sought to enjoin the brothers, along with the Genesis II Church of Health and Healing and the other two codefendants, from distributing Miracle Mineral Solution. The civil proceeding resulted in a temporary restraining order, a preliminary injunction, and then, after the government moved for and obtained a default judgment, a permanent injunction. The government's civil complaint sought only injunctive relief and did not request a jury trial. Because the brothers never appeared in the civil case, they also did not request a jury trial.

*Reasonableness of Their Sentences*

At trial, the government presented evidence that the brothers were selling chlorine dioxide to the public online. The brothers' email addresses were listed on the organization's contact card. Orders were shipped out from Jonathan's address. After an undercover agent successfully purchased chlorine dioxide from the website, he reached out to the organization. He wrote that his cancer-stricken wife had been taking the product for three weeks without her condition improving. Jordan responded by saying, "[t]hree weeks is not long enough for more serious diseases like cancer." Receipts confirmed that the brothers had made tens of thousands of sales and were making over $120,000 per month.

At the sentencing hearing, there was an exchange about whether the brothers had received the presentence investigation reports more than thirty-five days before the hearing. During Jonathan's hearing, given the brothers' earlier refusal to accept documents, the probation office confirmed that it had dropped off the reports in the jail's legal mailbox earlier in the week. At Jordan's sentencing hearing, he confirmed he had seen the report. The brothers made no specific objections to particular provisions in the report, but they did make general statements about the legitimacy of the proceedings. Jordan said, "[t]here is no valid claim by a man or woman. Therefore, there are no victims nor to whom restitution would be due." Jonathan likewise noted that "[he], living man, object[s] because there has not been any valid claims from any man or woman. There cannot be any losses or restitution."

Throughout the trial, the brothers questioned the legitimacy of the proceedings. For example, at a continuance hearing roughly eighteen months before trial, Jonathan asked, "why are the Grenons still being held when no crime has been committed nor has there been any intent to commit a crime and there are no victims?" "[Y]ou can order chlorine dioxide on Amazon, and many other companies provide it. It is not illegal and it can[not] be."

The presentence investigation reports calculated the brothers' guideline ranges as 151 to 188 months' imprisonment. The reports included four enhancements for the number of victims, vulnerable victims, the number of vulnerable victims, and the amount of loss caused. The district court adopted the reports and the advisory guideline ranges.

Three weeks before trial, the district court granted the government's motion to dismiss the contempt counts against the brothers' two codefendants because the extradition agreement with Colombia prohibited prosecution on those counts. However, the government proceeded with the contempt charges against the brothers. The brothers were convicted on all three counts and received 151 months' imprisonment; the codefendants were convicted on one count and received sixty months' imprisonment.

## DISCUSSION

We divide our discussion in six parts. First, we consider the brothers' contention that their waivers of the right to counsel were not knowing, intelligent, and voluntary. Second, we address the brothers' argument that they were denied their statutory and

constitutional rights to a speedy trial.  Third, we review the brothers' assertion that the indictment should have been dismissed under the Religious Freedom Restoration Act.  Fourth, we discuss the brothers' contention that the district court improperly relied on the Food and Drug Administration's interpretation of the term "intended uses."  Fifth, we consider the brothers' argument that the temporary restraining order and preliminary injunction were not lawful orders capable of supporting a criminal contempt conviction because the brothers were entitled to a jury trial in the civil proceeding.  And finally, we address the brothers' assertion that their sentences were not procedurally reasonable because the district court should have found that no enhancements for loss amount, or number and type of victims, should apply.

### Pro Se Representation

The brothers first contend that the district court erred when it allowed them to proceed pro se throughout the proceedings. They argue their various waivers of the right to counsel were not knowing, intelligent, and voluntary.

Whether a defendant's waiver is knowing, intelligent, and voluntary is "a mixed question of law and fact which this Court reviews de novo." *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc) (emphasis omitted).  On direct appeal, it is the government's burden to prove the waiver was valid.  *Id.*  "The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 87 (2004).  However, a defendant also

may choose to represent himself. *Faretta v. California*, 422 U.S. 806, 817 (1975). "Because the constitutional rights to counsel and to self-representation cannot be exercised at once, a defendant can exercise one only if he waives the other." *United States v. Hakim*, 30 F.4th 1310, 1322 (11th Cir. 2022). To waive the right to counsel, a defendant must unequivocally invoke his right of self-representation. *United States v. Owen*, 963 F.3d 1040, 1048 (11th Cir. 2020). His waiver also must be knowing, intelligent, and voluntary. *Id.* "If the waiver was not made by the accused with the requisite knowledge, then he has been deprived of 'the right to counsel.'" *Hakim*, 30 F.4th at 1322.

Here, the record shows the brothers made knowing, intelligent, and voluntary waivers of their right to counsel throughout the critical stages of the proceedings. We start with the brothers' initial appearance. "[T]he right to counsel attaches at the initial appearance before a judicial officer." *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 199 (2008). The magistrate judge appropriately alerted the brothers of their right to counsel, explained the maximum penalty they faced, explained the knowledge required to mount a defense, explained a federal public defender was present and ready to assist, and offered to adjourn until the next day if the brothers wanted to retain their own counsel or seek the assistance of a public defender. The brothers unequivocally waived their right to counsel.

The district court ensured the waiver remained effective all the way until the eve of trial where it performed one final *Faretta*

hearing. Standby counsel was present as they had been throughout. The district court asked the brothers, "do you wish to continue in this case representing yourselves?" As they had done on many prior occasions, the brothers did not respond. The district court asked again, "[d]o any of you wish to have counsel appointed to represent you in this case?" Again, the brothers were silent. The district court asked standby counsel, "can you advise whether any of the Defendants has sought your legal advice or assistance?" They replied that they had not.

"[A]n unwilling defendant can foil a district court's best efforts to engage in a dialogue, thereby preventing the court from eliciting clear information regarding the defendant's understanding of the dangers of proceeding pro se." *Garey*, 540 F.3d at 1267. That is what happened here. In this circumstance, so long as the district court "is assured the defendant (1) understands the choices before him, (2) knows the potential dangers of proceeding pro se, and (3) had rejected the lawyer to whom he is constitutionally entitled," it may allow the defendant to proceed pro se with standby counsel in place. *Id.* That is what the district court did here, and accordingly "a *Faretta*-like monologue . . . suffice[d]." *Id.* at 1269.

The brothers make several counterarguments, none of which are availing. First, Jordan argues that his waiver at the initial appearance was not unequivocal because he asked if his decision only applied to "this meeting." But the magistrate judge answered his question and Jordan then unequivocally expressed his desire to proceed pro se. He reaffirmed that decision at the next hearing a

16                    Opinion of the Court                    23-13478

day later and refused to speak with the standby federal public defender. He confirmed with the magistrate judge that he would let her know if he changed his mind at any point. He continued to clearly and consistently express his desire to represent himself until he requested counsel for the first time two years later.[2]

Second, the brothers argue that the district court erred when it noted their motion to dismiss was "bizarre" and directed the government to "indicat[e] whether it will be seeking psychiatric or psychological examinations," yet continued to allow them to represent themselves. But the district court did not err because, after it ruled on the motion to dismiss, the court held another *Faretta* hearing and determined the brothers were capable of representing themselves after appointing standby counsel for both brothers. The brothers do not point to anything calling that determination into question.

Third, the brothers maintain that the district court erred when after those hearings it found the brothers lacked "the skill or training to represent" themselves but still found their waiver of the right to counsel knowing, intelligent, and voluntary. A defendant's "educational background" and "understanding of rules of procedure [and] evidence" are relevant factors in determining the validity of a defendant's waiver. *Owen*, 963 F.3d at 1049. But "a defendant need not himself have the skill and experience of a lawyer in

_____

[2] Jordan also argues that his codefendants had a "coercive effect" on him, but we decline to evaluate an argument raised for the first time in a reply brief. *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

order competently and intelligently to choose self-representation." *Faretta*, 422 U.S. at 835. A district court need not determine "whether, for example, [the d]efendant could recite the steps to introduce a document into evidence." *United States v. Kimball*, 291 F.3d 726, 731 (11th Cir. 2002). Instead, "we need only to determine whether [the d]efendant understood that rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates and to determine whether Defendant understood that he would be bound by those rules." *Id*. At the *Faretta* hearings, the district court thoroughly explained the downsides of a lack of legal training and the brothers said that they wished to represent themselves.

Finally, Jonathan argues that the district court erred when it declined to appoint him a federal public defender after he requested one. Because Jonathan never formally requested counsel, there was no error here. As the district court correctly found, the motion was invalid because it was filed by a third-party nonlawyer. By the time the next status conference occurred, Jonathan told the district court that he, "the living man, d[id] not consent to having a lawyer." And even if Jonathan had made an effective request for counsel, he never showed he was entitled to court-appointed counsel. At the hearing to determine whether Jonathan was indigent, he refused to answer the magistrate judge's questions about his financial ability to obtain counsel. *See Owen*, 963 F.3d at 1052 (noting that a court must conduct an "appropriate inquiry" to determine whether a defendant is "financially unable to obtain counsel" before appointing counsel).

*Speedy Trial*

The brothers next contend their statutory and constitutional speedy trial rights were violated when the district court ordered several continuances before trial. "We review a claim under the Speedy Trial Act de novo and review a district court's factual determinations on excludable time for clear error." *United States v. Williams*, 314 F.3d 552, 556 (11th Cir. 2002). When reviewing a constitutional speedy trial claim, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).

Beginning with the brothers' statutory speedy trial claims, under the Speedy Trial Act the government was required to indict the brothers within thirty days of their arrest, and to begin trial within seventy days of filing the indictment. 18 U.S.C. § 3161(b), (c)(1). However, the Act also carves out several types of excluded time. *See id.* § 3161(h). Here, there were nine and a half months between arrest and indictment, and two years and three months between indictment and trial. But because each delay was permitted by statute, the district court did not err when it denied the brothers' motions to dismiss based on the statutory right to a speedy trial.

The first relevant exclusion is for "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." *Id.* § 3161(h)(6). The brothers were initially arrested on July 8, 2020 and were indicted on April 22, 2021. The

final codefendant had his initial appearance on July 28, 2022. So the question becomes whether these delays are reasonable under the statute. We have said that whether the period of delay is reasonable can be determined by "the totality of the circumstances prior to trial, by the extent to which the appellant's defense was prejudiced, or by the sheer length of the delay." *United States v. Davenport*, 935 F.2d 1223, 1236 (11th Cir. 1991).

As to the length of the delay, we have found similar ones reasonable. *See United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1476 (11th Cir. 1992), *abrogated on other grounds by Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994) (finding eighteen-month delay reasonable). As to prejudice, the brothers make no argument they suffered prejudice, and nothing in the record supports that they were prejudiced. And the brothers never moved for severance. Because the brothers cannot show the period of exclusion attributable to missing codefendants was unreasonable, this period was properly excluded.

Days after the final defendant was extradited on July 28, 2022, but around one month before trial was set to begin, the second relevant exclusion period began. Delays "resulting from any proceeding, including any examinations, to determine the mental competency . . . of the defendant" are also excludable under the Act. 18 U.S.C. § 3161(h)(1)(A). When the district court ordered competency evaluations for all four defendants, the government moved for a continuance, noting that the bureau of prisons could

not complete the competency evaluations by the time of the trial. The district court granted that motion until January 3, 2023.

Finally, once that exclusion period ended, the third exclusion period began when Jonathan requested a continuance at a status conference and Jordan asked to fire the federal public defender. Noting these developments, the district court made an ends-of-justice finding that the delay "to the scheduling of the trial [was] caused" by the brothers and set a trial period beginning in July 2023. *See* 18 U.S.C. § 3161(h)(7)(B)(iv) ("[A] judge shall consider in determining whether to grant a continuance . . . [w]hether the failure to grant such a continuance . . . would deny the defendant reasonable time to obtain counsel[.]").

This was well within the district court's "broad discretion" in managing "the mandates of the Speedy Trial Act and the exclusions thereto." *United States v. Ogiekpolor*, 122 F.4th 1296 (11th Cir. 2024) (quoting *United States v. Henry*, 698 F.2d 1172, 1174 (11th Cir. 1983)). The brothers never argue the ends-of-justice continuances were unwarranted. And the district court set forth its reasoning on the record as required. *See* 18 U.S.C. § 3161(h)(7)(A). We have approved of longer delays than this one when multiple excludable periods of time come together to form the delay. *See United States v. Register*, 182 F.3d 820, 828 n.8 (11th Cir. 1999) (38-month delay). Thus, the time up until July 3, 2023, was excludable, and only two weeks passed from that date to the beginning of trial. The brothers' statutory speedy trial argument therefore fails.

Turning to the brothers' constitutional speedy trial argument, here too the district court committed no error. The Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI.

The Supreme Court has held that when determining whether a defendant's speedy trial rights were denied, a court should consider the "[1] [l]ength of delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). We have held "a defendant generally must show actual prejudice unless the first three factors in *Barker* all weigh heavily against the government." *Davenport*, 935 F.2d at 1239.

The length of delay is a "triggering mechanism." *Barker*, 407 U.S. at 530. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* "A delay is considered presumptively prejudicial as it approaches one year." *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003). The delay is measured "between the date of the indictment and the trial date." *Id.* Here, over two years passed between the brothers' indictment and trial, so the delay was presumptively prejudicial.

Turning to the reason for the delay, much of it stems from the brothers. The Supreme Court has differentiated between deliberate, neutral, and valid reasons for delay. *Barker*, 407 U.S. at 531. The brothers' shifting stances on whether they wanted to

represent themselves and then firing various counsel appointed to them no doubt were responsible for some of the delay. But even if most of the delay was attributable to the government, like in *Davenport*, "the delays in this case were inherent to the government's good faith effort to conduct a complex, joint trial." 935 F.2d at 1239. And so "[t]he reasons for delay in this case were, at worst, neutral." *Id.* at 1240. That means "the reasons for delay do not weigh heavily against the government and do not excuse a showing of actual prejudice." *Id.*

It is thus unnecessary to examine the third *Barker* factor as the brothers cannot show that all three of the first factors weigh heavily in their favor, and so they must show actual prejudice. But the brothers do not even attempt to argue prejudice here. Their briefing instead relied on showing a presumption of prejudice. The brothers' constitutional speedy trial claim therefore fails.

### Religious Freedom Restoration Act

Third, the brothers contend that the district court should have dismissed the complaint based on the Religious Freedom Restoration Act. Generally, "we review the district court's denial of a motion to dismiss an indictment for abuse of discretion." *United States v. Grady*, 18 F.4th 1275, 1284 (11th Cir. 2021) (quoting *United States v. Farias*, 836 F.3d 1315, 1323 (11th Cir. 1016)). But "[w]hen the defendant does not preserve an argument for appeal, we review for plain error." *United States v. Straub*, 508 F.3d 1003, 1008 (11th Cir. 2007). Whether government action complies with the Act is a legal question we review de novo. *Grady*, 18 F.4th at 1285.

Pro se pleadings are construed liberally. *Tattenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Sometimes that may require determining whether an unclear claim fits in another recognizable form. *See United States v. Jordan*, 915 F.2d 622, 624–25 (11th Cir. 1990). But district courts need not consider arguments not properly presented. *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1352 (11th Cir. 2009). "[T]o preserve an issue, a litigant must 'first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it.'" *United States v. Pon*, 963 F.3d 1207, 1225 (11th Cir. 2020) (quoting *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012)).

We agree with the district court that this issue was never raised. When the government flagged the potential applicability of the Act in a motion in limine, the district court found that the brothers never sought dismissal based on the Act before trial. The brothers also never sought dismissal at or after trial. The brothers did bring an earlier motion to dismiss that asserted "[their] [r]eligious freedoms have been violated." But that statement did not clearly apply to any one government act. Instead, in context, the statement reads as a continuation of the brothers' sovereign-citizen-style argument from the previous sentence in their motion that they "are unaware that [c]orporate [b]y-laws do even apply to G-d fearing sons, ([m]ankind) not residing in a [f]oreign [f]ederal [d]istrict . . . ."

We therefore agree that the argument was not raised below. Because the brothers also do not point to a statute or on-point

precedent, there was no plain error. "When neither the Supreme Court nor this Court has resolved an issue, there can be no plain error in regard to that issue." *See United States v. Alfonso*, 104 F.4th 815, 829 (11th Cir. 2024).

The brothers counter that Jonathan's statements at his initial appearance ought to be liberally construed as raising a defense under the Act. At the initial appearance, Jonathan claimed "the First Amendment is being broken," that "chlorine dioxide . . . is [their] sacrament," and that "[f]or [the government] to be saying it [is] a drug, it [is] totally against [their] religious rights." But Jonathan's general statements were not enough to put the district court on notice that the brothers intended to seek dismissal under the Act. He mentioned that he thought the complaint, like the civil proceedings before it, was directed at the Genesis II Church of Health and Healing. Given this context it was impossible to infer that he sought dismissal under the Act.

### Deference to Agency Interpretation

Fourth, the brothers argue the district court plainly erred in instructing the jury and admitting expert testimony that inappropriately relied on the Food and Drug Administration's definition of the term "intended uses." "Where a party did not object to a jury instruction in the district court, we review that instruction for plain error." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). We also review the admission of expert testimony only for plain error where the defendant did not object below. *See United States v. Akwuba*, 7 F.4th 1299, 1313 (11th Cir. 2021).

Neither the government expert nor the district court erred by relying on the agency's definition of "intended uses."[3] According to the agency, "[t]he words *intended uses* . . . refer to the objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 201.128. This regulatory definition is at issue because two of the potential objects of the conspiracy involved selling an "unapproved drug" or a "mislabeled drug." In turn, the statutory definition of "drug" requires the substance to be "intended for use" in various medical applications. 21 U.S.C. § 321(g)(1).

The brothers argue that it is error to defer to an agency's interpretation of the law. They argue a district court must instead use its "independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). But this argument fails because the brothers never explain how the instructions or expert relied on the agency's definition instead of a commonsense definition of the term consistent with the plain meaning of the statute.

The jury instructions did not use the agency's definition. The district court instructed the jury that "a product's intended use is what a reasonable person would conclude the manufacturer or

---

[3] This claim of error could only possibly apply to the conspiracy count in the indictment. The collateral bar rule prevents a defendant in a criminal contempt proceeding from raising the invalidity of the underlying civil order as a defense. *Straub*, 508 F.3d at 1010. So, to the extent the brothers wish to challenge the validity of the civil order, or its definitions, they needed to do so in a direct appeal.

seller intended based on all the relevant information." And that the jury could "determine the intended use of a product by considering the label." In addition, while the expert examined the labeling as part of her investigation into whether the solution was an unapproved or mislabeled drug, the expert made clear that she relied on the statutory definition of drug to reach her conclusion.

While the agency's definition of intended use does emphasize the drug's label, we are unaware of any definition of the term "intended use" that would bar considering a product's label. And no regulatory definition is required to understand that a product's label might help the user determine whether he should use the product to treat an illness or instead use it to clean the floors. To the extent that a regulatory definition overlaps with the plain meaning of the statute, it is not error when the district court admits expert testimony or crafts a jury instruction consistent with that plain meaning.

The brothers counter that only the agency's definition of intended use "allowed for a wide enough net to capture Mr. Grenon's actions." The definition of "intended uses," they argue, was the "lynch pin" of the conspiracy charge. But that conflates the importance of the concept of the product's intended use—a necessary component of the offense—with the importance of the regulatory definition. The brothers never explain how the district court used

anything but its independent judgment in interpreting the statute.[4] Even if the district court had erred, the brothers do not explain how it was plain error. The brothers do not point to, and we are unaware of, any case that explains the implications of the Supreme Court's *Loper Bright* decision on the Food and Drug Administration's "intended uses" regulations. *See Alfonso*, 104 F.4th at 829.

### *Jury Trial*

Fifth, the brothers contend that the district court plainly erred by not dismissing the contempt charges against them despite the fact the temporary restraining order and injunctions were not lawful orders. "A valid conviction for criminal contempt requires proof of all the following: (1) the court entered a lawful order of reasonable specificity; (2) the defendant violated that order; and (3) the defendant did so willfully." *United States v. Robinson*, 83 F.4th 868, 878 (11th Cir. 2023). The brothers argue that because the district court entered a temporary restraining order and preliminary injunction (the two orders that form the bases for the contempt charges) against them without a jury trial in the civil proceeding, the orders were not lawful.

But the collateral bar rule prevented the brothers from attacking the validity of the civil orders in this criminal proceeding. *Straub*, 508 F.3d at 1010. While there are exceptions to that rule, the brothers do not argue for any here, and none apply. *Cf. In re*

---

[4] The brothers also argue that the term "adequate directions for use" was defined by the Food and Drug Administration. But they similarly fail to explain where and how the district court relied on this definition.

*Novak*, 932 F.2d 1397, 1401 (11th Cir. 1991) (allowing for challenges in instances where, for example, the issuing court "lack[ed] subject-matter jurisdiction").

### Reasonableness of Their Sentences

Finally, the brothers contend that their sentences were procedurally unreasonable because the district court should have liberally construed statements they made at sentencing as objections and granted those objections as they pertained to loss amount and number of victims.  We review interpretation and application of the sentencing guidelines de novo.  *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020).  We review underlying factual findings like loss amount and the number of victims for clear error.  *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011); *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013).  But where the district court states that, based on its consideration of 18 U.S.C. section 3553(a) factors, it would have imposed the same sentence regardless of any guideline-calculation error, the error is harmless if the sentence would be reasonable even if the district court's guideline calculation was erroneous.  *United States v. Keene*, 470 F.3d 1347, 1348–49 (11th Cir. 2006).

That's what happened here.  The district court said that the brothers' "sentence would be the same regardless of the additional enhancements."  And their 151-month prison sentences would

23-13478               Opinion of the Court                      29

have been reasonable even if the district court erred in calculating the guidelines.[5]

Even though they had no criminal history, the brothers' criminal conduct went on for years. They defrauded hundreds of people into buying bleach as medicine and they did so by targeting the sick and the dying—those with cancer, Alzheimer's, malaria, Parkinson's, Multiple Sclerosis, and HIV/AIDS. The brothers brought in more than a million dollars for their efforts. Yet, they refused to stop when the district court entered a temporary restraining order and then a preliminary injunction. Based on the evidence from trial, we do not have a definite and firm conviction that the district court made a clear error of judgment.

The brothers raise two other sentencing arguments that we must address. First, they contend that they did not get their presentence investigation reports more than thirty-five days before their sentencing hearing as required by Federal Rule of Criminal Procedure 32(e)(2). The brothers are right, but any error in failing to

---

[5] We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Irey*, 612 F.3d 1160, 1186, 1188-89 (11th Cir. 2010) (en banc). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* at 1189 (citation modified). We will only vacate a sentence for substantive unreasonableness where "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [section] 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190.

timely disclose the report was harmless.  *See United States v. Willis*, 649 F.3d 1248, 1257 (11th Cir. 2011).  The presentence investigation reports were available and disclosed forty-two days before sentencing.  But the brothers didn't get the reports because they refused to receive court documents.  Even so, the reports were hand delivered to them at the prison, they acknowledged receiving the reports before the sentencing hearing, and there's no indication that they were prejudiced by the late disclosure.

Second, Jordan argues that his sentence was substantively unreasonable because two of the three codefendants received shorter sentences than he did.  Section 3553(a) requires the district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Here, the two codefendants Jordan compares himself to were convicted of only one crime, while he was convicted of three.  While the defendants were charged with the same crimes initially, the government had to abandon the contempt charges against Jordan's codefendants because of the extradition agreement with Colombia.  The codefendants were therefore not found guilty of "similar conduct" for purposes of the sentencing factors.

**AFFIRMED.**